. STONE & BEST *vs.* WATSON.

[ACTION FOR DAMAGES ON ACCOUNT OF UNSOUNDNESS OF SLAVE.]

1. *Demurrer to original and amended complaints.*—Where the original complaint contains a single count, and an amended complaint is afterwards filed, containing several additional counts; a recital in the judgment-entry, that a demurrer was sustained "as to the first two counts in the complaint," will be construed to apply to the single count in the original complaint, and to the first count in the amended complaint.

2. *Averment of fact, and of conclusion.*—An averment that a slave is *unsound*, is the statement of a fact, and not of a conclusion from facts.

3. *Assignment of general and special breaches.*—In an action by the purchaser, against the vendor of several slaves, a count on a subsequent contract,—by which it was agreed, on account of the unsoundness of one of the slaves, who was warranted sound, that the vendor should take back said slave, and should pay the purchaser a specified sum of money, which sum the count seeks to recover,—does not require the assignment of a special breach (Code, § 2235); nor is a special breach required in a count on an alleged rescission of the original contract,

by subsequent agreement, on account of the unsoundness of one of the slaves.

4. *Proof of value of slave.*—In ascertaining the purchaser's damages, resulting from a breach of warranty of the soundness of a slave, proof of the value of the slave a few months after the sale is admissible, as shedding light on the question of value at the time of the sale.

5. *Same.*—A slave being described in the bill of sale as a seamstress, it is permissible for the purchaser, in an action to recover damages on account of her unsoundness, to prove what would have been her value, if sound, "taking into consideration the fact that she was a good, No. 1 seamstress."

6. *Same.*—In proving the value of a slave, a witness cannot be allowed to state what her value would be, "if she possessed the qualities which she *was reputed* to possess."

7. *Proof of medical bill, as part of damages.*—It is permissible for the purchaser, in an action to recover damages on account of the unsoundness of a slave, to prove at whose request a physician was called in to the slave, and as whose property the physician attended her ; but the physician's account for services rendered to the slave, which was paid by the purchaser, is not admissible evidence for him, until it has been proved that the services were rendered as charged, for the treatment of a disease existing at the time of the sale, and that the charges were correct.

8. *To what witness may testify.*—A witness may testify that a slave *looked* sick, although he is neither a physician, nor an expert.

9. *Declarations of sick slave.*—The ·declarations of· a slave while sick, as to the nature and symptoms of his disease, are competent evidence on the principle of *res gestæ,* as well as from the necessity of the case, although made to a person who is not a physician.

10. *Relevancy of evidence on question of·care on negligence.*—One of the questions in the case being, whether the purchaser was guilty of negligence in his treatment of a female slave, during the time she remained in his possession, before he tendered her ·back to the vendor ; and it having been proved that the slave was badly burned, while in his possession, by ·the accidental explosion of a fluid lamp, whereby her value was greatly impaired, and was afterwards sent by· him,· by the public stage, to the place of the vendor's residence,—it is permissible for him to prove ·that the slave violated his orders in using the lamp, and that he was advised by a physician, whom he consulted, that he might send her by the stage with safety.

APPEAL from the Circuit Court of Talladega..
Tried before the Hon. ROBERT DOUGHERTY..

THIS action was brought by S. D. Watson, against the appellants, as partners. The original complaint contained a· single count, claiming $3100 damages for a breach of warranty of soundness of three slaves—Sarah Ann, Eliza,

Stone & Best v. Watson.

beth, and Caroline, by name—sold by defendants to plaintiff on the 6th March, 1857; and an amended complaint was afterwards filed, in the following words:

"The plaintiff, by leave of the court had and obtained, claims of the defendants $2000 damages for a breach of warranty in the sale of certain slaves, to-wit, Sarah Ann, a seamstress woman, about twenty years old, Elizabeth, and Caroline, by the defendants to the plaintiff, on the 6th March, 1857; which slaves the defendants warranted to be sound and healthy, when, in fact, at the time of said sale and warranty, said slaves were unsound and unhealthy.

"The plaintiff claims of the defendants the further sum of $1300, due by contract made by them on the 1st July, 1857, substantially as follows: The plaintiff, on the 6th March, 1857, purchased from the defendants the negroes above mentioned, for the sum of $3150, (all of which was paid at that time,) and the said defendants then and there executed and delivered to plaintiff their bill of sale for said slaves, warranting them to be sound and healthy; but plaintiff avers, that said girl Sarah Ann was not sound and healthy at the time of said sale, but, on the contrary, was unsound and unhealthy; in consequence of which, plaintiff was greatly injured, to-wit, in the sum of $1500, for which the defendants thereby became liable to him in an action at law; and the defendants, in consideration thereof, on the 1st July, 1857, agreed with plaintiff to take back said Sarah Ann, and to pay plaintiff the sum of $1300; and plaintiff agreed, on his part, to return said slave; and in pursuance thereof, he did, on the 8th July, 1857, return her to the defendants; yet they have failed and refused to pay said sum of money, or any part thereof.

"The plaintiff claims of the defendants, also, the further sum of $1300, for that the plaintiff, on the 6th March, 1857, purchased of the defendants the slaves above named, for $3150, (all of which was paid on said day,) and the defendants then and there executed and delivered to plaintiff their bill of sale for said slaves, warranting them to be sound and healthy; but plaintiff avers, that said slave

Sarah Ann, at the time of said sale and warranty, was not sound or healthy, but, on the contrary, was much diseased; in consequence whereof, the defendants became liable to an action at law by the plaintiff; in consideration whereof, the defendants agreed with the plaintiff to pay him the sum of $1300, and to take back said slave Sarah Ann; and the plaintiff, in pursuance of said contract, on the 8th July, 1857, tendered and offered to deliver said slave to defendants, but the defendants refused to receive said slave, and also failed and refused to pay said sum of money, or any part thereof, to the said plaintiff.

"The plaintiff claims of the defendants the further sum of $1300, for that the plaintiff, on the 6th March, 1857, purchased of the defendants the negroes above named, for the sum of $3150, (which was all paid at that time,) and the defendants then and there executed and delivered to plaintiff their bill of sale for said slaves, warranting them to be sound and healthy; but plaintiff says, that said Sarah Ann, at the time of said sale and warranty, was not sound or healthy, but was diseased, unhealthy, and worthless; whereby defendants became liable to plaintiff in an action at law; in consequence whereof, defendants agreed, on the 7th July, 1857, to pay plaintiff $1300, and to take said slave back, and to go or send [to] plaintiff for her, and plaintiff agreed, on his part, to deliver her up to defendants when desired; but plaintiff says, that defendants utterly failed and refused to go or send for said slave, or to pay plaintiff said sum of money; whereupon, plaintiff tendered said slave to defendants, but they failed and refused to receive her, or to pay said sum of money, or any part thereof.

"The plaintiff claims of the defendants the further sum of $1300, for that the plaintiff, on the 6th March, 1857, purchased of the defendants the negroes above named, for the sum of $3150, (all of which was paid at the time,) and the defendants then and there executed and delivered to plaintiff their bill of sale for said slaves, warranting them to be sound and healthy; but plaintiff avers, that said slave Sarah Ann, at the time of said sale and delivery, was dis-

eased, unsound, and worthless; in consequence whereof, plaintiff, on the first June, 1857, returned her to defendants, and rescinded said sale as to said slave; by means whereof, defendants became liable to an action at law, in favor of the plaintiff; in consideration whereof, defendants agreed to pay plaintiff the sum of $1300, but they have failed and refused so to do."

(The three remaining counts of the amended complaint are the common counts for money had and received, money paid, laid out and expended, and work and labor done.)

The judgment-entry recites, that the defendants demurred, in short by consent, to the entire complaint, and to each count thereof; that the assignment of special grounds of demurrer was waived; that the court sustained the demurrer "as to the first two counts in the complaint," and overruled it as to the remaining counts and the whole complaint; and that the defendants then pleaded the general issue, "with leave to give any special matter in evidence, and with like leave to the plaintiff in reply."

On the trial, as appears from the bill of exceptions, the plaintiff read in evidence to the jury, after proving its execution, the defendants' bill of sale for the slaves, which was dated the 6th March, 1857, contained a warranty that the slaves were sound and healthy, and described the girl Sarah Ann as "a seamstress woman, about twenty-four years old;" and then offered in evidence the deposition of Dr. B. C. Jones, which was taken on interrogatories and cross-interrogatories. The third direct interrogatory to this witness was in these words: "Int. 3. *What would said girl have been worth, when you first visited her, if she had been sound, taking into consideration the fact that she was a No. 1 seamstress? what was she worth, at that time, in the condition in which she really was? what would she have been worth, on the 6th March,* 1857, *if she had been sound, and a good, No.* 1 *seamstress?* what was she worth, at that time, in her then condition as to health?" The defendants objected, at the time of filing cross-interrogatories, to each of the italicized portions of this interrogatory, and renewed

their objections at the trial; but the court overruled each of the objections, and they excepted. Another interrogatory to this witness called on him to state "by whom, at whose request, and as whose property, he was called in to attend the girl Sarah Ann;" and exceptions were reserved by the defendants to the overruling of their objections to this interrogatory. The witness testified, in substance, that he was called in by plaintiff, in May or June, 1857, to prescribe for the girl Sarah Ann; that he then found she "had a slight disease of one of her lungs," which, he thought, must have existed on the 6th March, 1857; and that he was afterwards called in to prescribe for her on account of a burn on her left arm. The bill of exceptions states, that "there was no proof as to the qualities or acquirements of said negro, other than the statement in the bill of sale that she was a seamstress."

"The plaintiff introduced evidence, also, tending to show an agreement between him and the defendants, made in Talladega, where the defendants lived, some time after the sale, (the negro being then in the plaintiff's possession, in the city of Montgomery,) by which it was agreed that, if said negro was unsound at the time of the sale to plaintiff, defendants would take her back, and would pay plaintiff $1250, by way of expenses, and her stage fare from Montgomery to Talladega; but, as to what this contract was, there was a conflict in the proof,—some of the evidence tending to show, that the defendants agreed to take her back, and to pay as above stated, if she was unsound at the time of the sale, and was delivered to them, in Talladega, in the condition she was at the time of the sale. At the time this agreement was made, (whatever it was,) the negro had not been burned; but afterwards, while she was in the plaintiff's negro-house in Montgomery, and under the charge of one Ball, plaintiff's agent, she received a burn upon her left arm, by the explosion of a fluid lamp, which was kept in said negro-house by said Ball, and which she was at the time attempting to use; and all the evidence tended to show, that her permanent value was thereby

decreased one-half, or more. Some —— days after she was thus burned, said negro was sent, by plaintiff's agent, or by his directions, on the stage, to Talladega, where she was tendered to the defendants, who refused to receive her, or to pay the $1250. Said Ball testified, in behalf of the plaintiff, that he was in plaintiff's negro-house, acting as his agent, when said negro was purchased by plaintiff, and came to said house; and that said negro, when she came to said house, coughed, *looked sick, and complained to witness of a pain in her breast.* It being admitted that this witness was not a physician, the defendants objected to" the italicized portions of his evidence, as being illegal and irrelevant, and reserved exceptions to the overruling of their objections. "This witness further testified, *that the negro was not allowed, by a rule of the house, to use said lamp,* in using which she was burned; that Dr. B. C. Jones was called in to attend her, and treated the burn several days; that when he was about to send the negro to Talladega, *he consulted Dr. Jones as to whether it would be safe to send her by the stage; and that Dr. Jones told him, in his opinion it would be safe to send her to Talladega on the stage.*" The defendants objected to each of the italicized parts of this evidence, on the ground of illegality and irrelevancy, and reserved exceptions to the overruling of their objections.

On cross-examination of one Thomason, one of defendants' witnesses, who had stated that he knew the negro in controversy, the court permitted the plaintiff to ask him, against the defendants' objection, what was the value of the negro at the time of the trial, which was in May, 1859; and the witness having answered, "that he did not know the qualities of the girl of his own knowledge, but knew them from reputation," the court permitted the plaintiff to ask him, against the defendant's objection, "what would be her value, if sound, if she possessed those qualities which she was reputed to possess;" and the defendants reserved exceptions to each of these rulings of the court.

The court also permitted the plaintiff to read in evidence to the jury Dr. Jones' account for medical services ren-

dered to the slave, on proof of the doctor's signature to the receipt acknowledging payment by the plaintiff. The defendants objected to the admission of this evidence, "on the grounds that it was illegal, irrelevant, calculated to mislead the jury, and because there was no proof that the amounts charged were reasonable and proper, and because there was not sufficient proof that the plaintiff had paid said accounts;" and reserved exceptions to the overruling of these several objections.

The several rulings of the court on the pleadings and evidence, as above stated, are now assigned as error.

HEFLIN, MARTIN & FORNEY, for appellants.
L. E. PARSONS, and JNO. WHITE, contra.

A. J. WALKER, C. J.—In the original and amended complaint, adding additional counts, there were nine counts. The record informs us, that the defendants' demurrer to the first two counts was sustained, and that it was overruled as to the remaining counts. From this we understand, that the demurrer was sustained as to the single count in the original complaint, and as to the first count in the amended complaint, and that it was overruled as to the last seven counts in the amended complaint.

[2.] Two reasons are urged, why the court below erred in so overruling the demurrer to the seven counts. The first reason is, that the averment of the unsoundness of the slave is the statement of a conclusion, and that therefore it was necessary for the pleader to have alleged in what the unsoundness consisted. From this argument we must dissent ; for we regard unsoundness as a fact, which may appropriately be averred in pleading.

[3.] The second reason urged in support of the demurrer, is, that the counts are misjoined, because some of them require a special breach, while others do not.—Code, § 2235. This argument, we think, is also unsound, for we do not regard either of the counts as requiring a special breach, in the sense in which that phrase is used in the above cited section of the Code.

[4.] In ascertaining the damages resulting from the breach of warranty of soundness, the proper inquiry, of course, was as to the value of the slave at the time of the sale. But it was permissible to prove what her value was a few months afterwards, as reflecting light upon the question of her value at the time of the sale.— *Ward v. Reynolds*, 32 Ala. 384. There was, therefore, no error in overruling the first three objections to the interrogatories propounded by the plaintiff to Dr. B. C. Jones.

[5.] The defendants objected to an interrogatory to the witness Jones, inquiring what would have been the value of the slave, if she had been sound and "*a good, No. 1 seamstress.*" It was certainly proper to prove the value of the slave with her qualities upon the hypothesis of her soundness.. The bill of sale made by the defendants to the plaintiff represented the slave to be a seamstress, but did not specify that she was a seamstress of quality *known as No. 1.* We think it probable, that the fact that the negro's quality as a seamstress was made the subject of a special and formal description in the bill of sale, authorized an argument to the jury that she possessed some eminence of skill as a seamstress, and might be classed as No. 1. If there was any tendency of proof to show that she was a "No. 1 seamstress," it was permissible to inquire as to her value upon that supposition.. We decide, though with some doubt, that there was in the statement of the bill of sale such tendency of proof, and that therefore there was no error in overruling the fourth objection to the plaintiff's interrogatories to Jones.

[6.] The evidence of Thomason, as to the value of the slave according to the qualities which she was reputed to possess, was manifestly inadmissible. The legitimate inquiry was, her value upon the supposition of the qualities which she did possess, and not of those she was reputed to possess.

[7.] The inquiries of the witness Jones, as to the person by whom, and at whose request, he was called to visit the slave in her illness, and as whose property he visited

her, were calculated to elicit information of the facts necessary to sustain the plaintiff's claim for damages on account of a medical bill contracted in treating her disease. The objection to that inquiry was, therefore, properly overruled.

The court erred, however, in admitting in evidence the account of Dr. B. C. Jones, there being no evidence of its correctness. The account could, upon no principle of law, be admissible, until it was proved that the services were rendered as charged, and that the charges were correct. Besides, the account could not be evidence, unless it was contracted for the treatment of a disease which the slave had at the time of the sale.

[8.] Evidence that the slave *looked sick*, conduced to establish a fact, which was one of the material matters in issue. The appearance of a slave is certainly a fact, and not a conclusion, and is susceptible of proof by one not an expert, who has seen the slave.

[9.] The declaration of the slave, as to the present existence of a pain in her breast, was clearly admissible; and the point has been repeatedly so adjudged by this court.— *Wilkinson v. Moseley*, 30 Ala. 562; *Barker v. Coleman*, 35 Ala. 221.

[10.] At least under some of the counts in the complaint, evidence as to whether the burning of the slave was caused by the plaintiff's negligence, was admissible. 1 Parsons on Con. 445. To this question, the fact that the slave was, by a rule of the house in which she was kept by plaintiff, not allowed to use the lamp, in using which she was burnt, was clearly pertinent, and there was no error in admitting that fact in evidence. And so, also, in the same point of view, the fact that the plaintiff consulted a physician, as to the prudence and safety of sending the slave to Talladega; and that Dr. Jones, being a physician who had treated her case, advised him that she might be safely sent, would be competent evidence upon the question, whether the defendant was guilty of any negligence in sending the slave to Talladega. The unsworn opinion given

by Dr. Jones would not be evidence that it was safe to so send the slave; but the fact that he was consulted, and so advised, has a direct bearing upon the question, whether the plaintiff acted carelessly and incautiously.

We deem it proper to observe, in reference to the 6th count, which avers a delivery of the slave to the defendants, and an agreement on their part to pay, in consideration thereof, the sum of thirteen hundred dollars, that we regard it as showing a rescission by consent of both parties, and that we must not be understood as affirming that it is good as a count for a rescission against the wishes, and without the consent of the defendants.

Reversed and remanded.

Stone, J., not sitting.