## STATE *v.* G. W. CUNNINGHAM.

Where, upon the trial of an indictment for murder, a juror related to the prisoner was passed by the State, the Solicitor being ignorant of such relationship, and upon being tendered, made known the relationship himself, before being sworn: *Held*, that it was not error for the Court to stand such juror aside until the panel was completed.

Where a prisoner relies upon the plea of insanity, but there is no evidence whatever that he had ever exhibited any sign of insanity, evidence tending to show that some of his uncles and aunts were insane, is inadmissible.

Section 115 of chapter 31, Rev. Code, relating to the removal of causes, not being digested nor brought forward, is not repealed by section 2, chap. 121, Bat. Revisal; and the Superior Courts have the same authority to remove criminal causes to adjacent counties, as they had before the compilation of that Revisal.

The sentence of the Court must be carried into execution by the sheriff of the county in which the prisoner is tried.

(*Adair's* case, 66 N. C. Rep. 298; *State* v. *Christmas*, 6 Jones, 376; *Twigg's case*, 1 Winst 142; *State* v. *Woodside*, 142, cited and approved.)

INDICTMENT for MURDER, tried before *Watts, J.,* at Fall Term, 1874, MADISON Superior Court.

The defendant was charged with the murder of one Daniel Sternbergh, in the county of Buncombe, and the case was removed to Madison county upon the affidavit of the defendant.

Upon the trial one G. W. Rhodes, one of the *venire* came upon the stand, was passed by the State, and tendered, whereupon he remarked he did not wish to be a juror in the case, as he was a cousin to the prisoner. The counsel for the State stated that he was not aware of the jurors relationship at the time he passed him. The juror was ordered to stand aside, whereupon the prisoner excepted.

The facts as disclosed by the evidence are as follows: The deceased, a citizen of Kansas, some two weeks before his death, arrived at Old Fort, in the county of McDowell, and was engaged in examining the mineral regions in the neighborhood.

As he was about leaving Old Fort on a stage in company with one Gaston, with the intention of going to Macon, and other Western counties, the prisoner drove up with a wagon. The deceased asked him how near he would go to Asheville on his return. The prisoner replied that he would pass within two miles of Asheville. The prisoner was driving a wagon for one Dr. Fletcher. The deceased and prisoner made a contract, by which the prisoner agreed to carry the baggage of the deceased to Swannanoa bridge, two miles from Asheville, for fifty cents. Thereupon the deceased placed his baggage, a valise and overcoat in the wagon and started up the mountain, a short distance ahead of the prisoner. He was next seen at the toll gate near the top of the mountain, still ahead of the wagon. The prisoner arrived at the toll gate with the wagon, a short while after the deceased left. The deceased next stopped at Kerley's, two miles below the gate, remained some time, and enquired for a good place to stay all night. Was recommended to stop at Mr. Alexander's four miles below that point. The prisoner drove up about that time and said he could drive that far that evening. It was then about three or four o'clock on the 6th of June. The deceased and prisoner then left, deceased walking by the wagon. Before they passed out of sight, the deceased was seen to get into the wagon. About dark the wagon was seen and recognized at camp on the North fork of the Swannanoa, and two men sitting by the fire. About nine or ten o'clock Mrs. Stepp, residing some four hundred yards from the camp, heard a pistol or gun shot, and cries as if in pain following immediataly. The wagon was heard to drive away from the camp just before day light next morning, was seen and recognized at Alexander's a mile below, driving rapidly down the river. At eleven o'clock the prisoner stopped, four miles from Asheville on the Henderson road, and about fifteen miles from the camp, and asked for dinner, saying that he had eat no breakfast that morning, as he was sick. This was on Sunday. On the following Friday Maj. Porter discovered the body of the deceased, in a mutilated condition. This was two hundred

yards below the camping place, in the river. The body was badly mutilated. In the face below the eye was a hole, apparently made by a bullet. An inquest was held and upon examination of the camp ground a pencil and pair of spectacles were found and identified as the property of the deceased. A large firebrand was also found upon which was hair and blood. Near the edge of the water were found blood and brains covered with leaves, and the leaves covered with stones. The body was identified as that of Daniel Sternbergh. The Coroner issued a warrant for the arrest of the prisoner. At the time of his arrest a pin cushion, a pocket knife, two pocket books, a watch and chain, a dirk knife and a pair of gloves were found in the possession of the prisoner, and identified as the property of the deceased. While under arrest and on his way to Asheville, the prisoner without any promise, threat or inducement expressed or implied, stated to one of the guard, the others not being present, that he had killed the deceased, that they were both drunk and playing cards and got into a dispute in the course of which deceased gave the prisoner the lie, whereupon the prisoner seized an axe and deceased a stick, prisoner got the first lick, struck deceased on the head and face and killed him. While in jail prisoner sent for one J. J. Ledford, a deputy sheriff who had charge of him, and voluntarily told him where the valise and overcoat might be found. In pursuance of this information the sheriff went to the place designated and found them. The prisoner subsequently told Ledford that he, the prisoner, killed the the deceased for his money, that he had prepared the plan before he reached the camp, that he had feigned himself sick and purposely delayed the wagon so that the deceased could not get to Alexander's, and had arranged the camp fire and camp chest with a view to the murder. That while at supper he pretended to be sick, got up, went to the fire and cut off a stick of wood, and while the deceased was looking in another direction, he struck him in the head with the axe. He then dragged him to the water when

the deceased making some struggles and noises, he struck several more blows, robbed him and threw him into the river.

The prisoner objected to the admission of these declarations The objections were overruled and the prisoner excepted.

The prisoner relied on the plea of insanity, and introduced evidence to show that two aunts on his mother's side were demented, and two aunts on his father's side were weak minded and " crochety;" that a great uncle had committed suicide, under a temporary fit of insanity, and that a distant relation had recently been committed to an insane asylum.

There was no evidence that the prisoner had exhibited any signs whatever of insanity.

The prisoner asked his Honor, among other things, to charge the jury : " Though the evidence may leave the question of insanity in doubt, if upon the whole evidence in the case the jury entertained a reasonable doubt as to the perfect sanity of the prisoner, at the time of the commission of the alleged act, (if committed at all,) then they were bound to acquit him."

The prisoner further asked the Court to charge the jury that " the jury have the right, from their own knowledge of human nature and the tendencies of the human mind, in addition to and in confirmation of the evidence of experts and others, touching the question of insanity, to say how far the circumstances, at and after the time of the alleged act, which were relied upon to show insanity when the alleged act was committed, are evidence of such insanity at that time, and if such evidence and circumstances leave their minds in doubt as to his insanity, then they are bound to acquit him."

The prisoner further asked the Court to charge the jury, " that to constitute a crime, the accused must be acted on by a motive and governed by a will."

His Honor was also asked to charge " that the diseased condition of mind of the prisoner's blood relation, from his paternal grand mother and her blood relations, down to his generation in all its branches as well as the conduct of the prisoner before, at the time of, and after the alleged commission of the

act, are evidence for the jury to consider, in making up their verdict in this case, and if from all these things they believe that the prisoner was insane, either morally or intellectually, at the time of said act, or have a reasonable doubt as to whether he was sane or insane, or laboring under a diseased state of mind so as to be deprived of reason for the time, then it will be their duty to acquit him."

The prisoner further asked his Honor to charge: " That to make the prisoner responsible for the act charged upon him, he must have been intellectually and morally sane in reference to that act as well as to the deceased, at the time of its commission." All of which special charges his Honor refused to make.

The prisoner excepted to the ruling of the Court in refusing to make the special charges requested.

The jury returned a verdict of guilty, judgment was rendered, and the prisoner appealed.

*Shipp & Bailey*, for the prisoner.
*Attorney, General Hargrove*, with whom was *Collins* and *Davidson*, for the State.

BYNUM, J. The prisoner was charged with the murder of one Daniel Sternbergh.

In making up the jury on the trial, one of the *venire* was called, and not being challenged by the State, was tendered to the prisoner, but before he was accepted, he objected to himself as being of kin to the prisoner. The Court thereupon stood him aside and the prisoner excepted. The jury was then completed without exhausting the prisoner's right of peremptory challenge. In the *State* v. *McNair*, 66 N. C., 298, after twelve persons were tendered and accepted by the prisoner and sworn, but before they were empannelled, the Court was informed that one of the jurors was related, by affinity, to two of the prisoners which, upon inquiry, appeared to be so but the fact was not known when the juror was sworn. The

juror was discharged, and after exception thereto, another was tendered and taken. On appeal, it was held by this Court, that as the jury was not empannelled and charged with the case, it was within the discretion of the Court to allow the State the benefit of a challenge for cause, so as to secure a jury indifferent as between the State and the prisoner. Certainly it can be no less within his discretion, when the proposed juror is not only not empannelled and charged with the case, but not so much as accepted and sworn. As the prisoner obtained a jury of his own selection, in no point of view was, he prejudiced by the action of the Court.

The prisoner, in his defence, relied upon the plea of insanity, and to establish it gave in evidence that some of his uncles and aunts were insane, but the case states that "*there was no testimony whatever that the prisoner had exhibited signs of insanity,*" and the testimony, which is made a part of the case, fully bears out the statement just quoted. When a foundation is laid by *some* evidence tending to show insanity in the prisoner, it is held admissible in corroboration, and as an additional link in the chain of circumstances to give in evidence, a hereditary taint in the blood, of a like malady. But it has never been held in this State, or elsewhere, so far as our researches extend, that such evidence is admissible by itself, and without some testimony that the prisoner himself was affected by some form of mental alienation. To allow such evidence to go to the jury as independent proof of the insanity of the prisoner, would be of the most dangerous consequence to the due administration of criminal justice, since there are but few persons, it is ascertained, who have not had ancestors or blood relations near, or remote, affected by some degree of mental aberation. To admit such testimony, then, under the conditions set forth in this case, would break down the strongest barriers to crime established by the laws of evidence, as heretofore understood. *State* v. *Christmas*, 6 Jones, 376.

The special instructions for the jury, as to the insanity of the prisoner, should have been denied in every form in which

they were presented, and the Judge should have told the jury that there was *no* evidence of the prisoner's insanity. Instead of doing this, his Honor gave the prisoner the full benefit of the instructions asked for by his counsel, not indeed in the precise form asked for, but in substance and effect. For one of the instructions asked for by the prisoner's counsel was that "if the jury believe that at the very time of the commission of the act alleged against him, the prisoner was from causes either of congenital mental taint or otherwise then operating on his mind, or suddenly occurring to him, unconscious of the nature of the act in which he was engaged, he ought to be acquitted." This charge his Honor gave and repeated it in four other forms out of eleven, in which the ingenuity of counsel contrived to present the same thing in substance and legal effect. If, therefore, there had been any evidence of insanity to go to the jury, the prisoner would not have been entitled to a more favorable charge.

But as the charge was upon purely a hypothetical state of facts, it was in error in favor of the prisoner, of which he cannot complain. We are therefore relieved from any examination of the special instructions allowed or refused, or of the conditions and limitations, under which evidence of hereditary insanity becomes admissible.

The objection has been here made, that the Court which tried the prisoner, had no jurisdiction of the case. The indictment was found in the county of Buncombe, and upon the application and affidavit of the prisoner, that he could not have an impartial trial in that county, the Court ordered the case to be removed to the county of Madison, for trial, and he was there tried. This order of removal was made under the provisions of the Rev. Code, chap. 31, sec. I15. It is insisted by the counsel of the prisoner, that this provision for the removal of causes, having been omitted in Battle's Revisal, and chap. 121, sec. 2, of this Revisal, having repealed "all acts and parts of acts, therefore passed, the subjects of which are digested and compiled in the Revisal, or which are repugnant to the

provisions thereof," that by force of this section, the provision of the Rev. Code, for the removal of criminal actions, was repealed. If such is the proper construction of the effect of chap. 121, of the Revisal, the Court which tried the prisoner, had no jurisdiction, even if such a construction should operate in many cases, as a denial of justice.

It thus becomes necessary to inquire and ascertain, what effect is to be given to Battle's Revisal, as a digest and compilation of our laws. And to arrive at a just conclusion upon this question, we must put together and construe as one act, the act which authorized the compilation, and the act which subsequently put the Revisal into operation.

Chapter 210, of the Acts of 1871–'72, is entitled, " An Act to provide a compilation of the public statutes," the first section of which provides, "that William H. Battle be and he is hereby appointed a commissioner to collate, digest and compile all the public statute laws of the State, now in force or in use &c., distributing them under such titles, divisions and sections as he may think convenient and proper, to render the said acts more plain and easy to be understood." It is thus seen that the legislative purpose was, that the commissioner should collect together the scattered public statutes, into one book for easy reference and so arranged as to be " more plain and easy to be understood." He had no authority to omit any, but on the contrary, he was charged to " compile *all* the statute laws now in force." To carry out the original design, and in execution thereof, chap. 74 of the Acts of 1872–'73, was passed after the work was compiled, the second section of which enacts, " that all acts and parts of acts, &c., the subjects whereof are digested in this Revisal, or which are repugnant to the provisions thereof, are hereby declared to be repealed," &c. Construing these two acts together, two conclusions are apparent: 1st. That *all* the public statutes were intended and directed to be compiled ; and 2d, that only " those acts and parts of acts, the subjects whereof are digested and compiled in the Revisal or which are repugnant to the provisions thereof," are ex-

pressly repealed. A satisfactory reason for this cautious, additional repealing clause, may be found in the fact the Revisal never passed through the process of legislative scrutiny and enactment. It might well be supposed, that great mischief would result, if important public laws should be left out of the Revisal, and be swept from the statute book, by a broad repealing act. If such had been the legislative intent, nothing could be more obvious, than the mode of carrying that purpose into execution. The repealing act would have been in this wise: " All the public statutes of the State, not contained it Battle's Revisal, are hereby repealed." That a very different and limited act of repeal was adopted, is certain evidence, that a very different and limited repeal was intended.

The law does not favor implied repeals of statutes, and a repealing act, therefore, will not be extended by implication, beyond the plain and obvious intent of its enactment. *State* v. *Woodside*, 9 Ird. 496. A statute which may be construed without violence to its provisions, so as to accomplish the public object within its provisions, and at the same time prevent a public mischief, which would result from a contrary construction, upon every principle of justice and equality, must receive that construction.

The conclusion would seem to follow, that all acts and parts of acts then in force, and which are omitted in the Revisal, are unrepealed and in full force and effect, as much so as if the Revisal had never been. What effect, then, is to be given to this compilation, by the Courts. The answer is, that just that effect is to be given to it, as was intended and declared to be, by the Legislature, in sec. 12, chap. 121. " The copies of the said Revisal which shall be printed as aforesaid, shall be received as evidence of the law, before all the tribunals, and in all places, in the same manner to all intents and purposes, as the originals in the office of the Secretary of State." Higher sanctity could not be given to it, than the original acts therein digested and compiled. Whether, according to the spirit of our Constitution and form of government, it would be com-

petent for the Legislature to declare *a book* to be the law of the State, or, which is the same, conclusive evidence of the law, without that book having passed through the constitutional forms of legislation, as the Roman emperors did by edict, is a question which does not now arise, as all the statutes contained in the Revisal, had been enacted and were in force, prior thereto, and it was neither the intent or effect of the Revisal, to give the statute law of the State other or greater validity than it then had.

Applying these conclusions to our case, it appears that the whole of chap. 31, Rev. Code, the 115 sec. of which provides for the removal of criminal actions to another county for trial, is omitted in the Revisal, and although this section was then law, through some inadvertence the compiler failed to digest and bring it forward in the Revisal. We hold that that section of the Rev. Code, is not repealed, and that under it, the Court had the power to remove the cause to an adjacent county for trial.

But in passing judgment upon the prisoner and as a part thereof, his Honor ordered that the prisoner be executed in the county of Buncombe where the bill had been found. This was error.

The sentence of the Court must be carried into execution by the sheriff of the county where the trial took place. *State* v. *Twiggs*, 1 Winst. 142. As, however, upon the return of the certificate of the opinion of this Court, to the Court below, the prisoner is to be re-sentenced, this error of his Honor can be then corrected. *State* v. *Cook*, Phil. L. 535.

There is no error.

PER CURIAM.                    Judgment affirmed.