JAMES F. WALSH, Plaintiff in Error, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendant in Error.

The right of review by an appellate court in a criminal action is limited to exceptions taken on the trial to decisions of the court, and to errors appearing upon the face of the record.

*It seems* that where justice has been perverted by practice *dehors* the record, or the accused has been injured by any circumstance occurring on the trial, not the subject of legal exception, the legal remedy of the party aggrieved is by a motion for a new trial.

As a general rule the interference of the court with counsel, when opening a case to a jury, is a matter of discretion, the exercise of which is not the subject of exception.

Upon the trial of an indictment for murder, the district attorney, while opening the case, handed to the jury a photograph which he stated was a likeness of the deceased, a young girl ; the prisoner's counsel thereupon objected ; the court replied, in substance, that the objectionable act had been done and could not be recalled. *Held,* that an exception was untenable.

The error book was supplemented by an affidavit of the prisoner's counsel to the effect that while the colloquy was going on between the counsel and the court, the photograph was examined by jurors who had not before done so. *Held,* that although the court might have interfered and prevented such examination, its omission to do so when attention was called to the subject did not constitute legal error.

It appeared that the prisoner, on the morning of the homicide, procured the knife to be sharpened with which it was done ; that he also asked a fellow workman where the heart was located. Evidence was then offered and received under objection and exception to the effect that on the same morning he asked another workman if pepper thrown in the eyes would blind a person, and what would be done with him if such a thing should happen, and that he was informed he would be sent to State's prison. *Held* no error ; as with the other circumstances, it authorized an inference that the prisoner was then meditating a personal injury to the deceased.

The defense was insanity.   After proof had been given that the prisoner's
father had epileptic fits, but before any evidence as to the insanity
of the prisoner, or any member of his family, or tending to show that
epilepsy is a disease which affects the mind, a witness for the defense
was asked if he had noticed at any time any thing strange in the conduct
of a brother of the prisoner ; this having been objected to by the prose-
cuting attorney, the court stated that it was proper for the defense to show
that the father was afflicted with any disease of the mind, and afterward
to prove such a disease hereditary ; said attorney then stated he would
concede that other members of the family have shown strange and un-
usual conduct.   The question was then repeated, was objected to and ex-
cluded.   *Held* no error.

*It seems* that in such a case it is competent, in aid of other proof tending
to justify an inference of insanity at the time of the commission of the
act to show that the prisoner inherited a disease which predisposed him
to insanity, and also to show insanity of parents or relatives.

The order of proof, however, is in the discretion of the court.

(Argued March 8, 1882 ; decided April 11, 1882.)

ERROR to the General Term of the Supreme Court in the
second judicial department to review a judgment entered upon
an order made December 12, 1881, which affirmed a judgment
of the Court of Oyer and Terminer in and for the county of
Kings, entered upon a verdict convicting the plaintiff in error
of the crime of murder in the first degree.

The material facts are stated in the opinion.

*A. H. Dailey* for plaintiff in error.   The exception
to receiving the photograph of the deceased in evi-
dence was well taken.   (*People* v. *Cowley,* 11 W'kly Dig.
516 ; *Cozzens* v. *Higgins,* 1 Abb. Ct. App. Dig. 453 ; 3 Keyes,
206 ; *Udderzock's Case,* 76 Penn. St. 340 ; *Ruloff* v. *People,*
45 N. Y. 213 ; *Marcy* v. *Barnes,* 16 Gray, 162 : *Hynes* v. *Mc-*
*Dermott,* 22 Alb. L. J. 368.)   The affidavit of Mr. Dailey should
be considered a part of the record.   (*People, ex rel. Dailey* v.
*Livingston,* 79 N. Y. 292 ; *Hunt* v. *People,* 76 id. 89 ; *People*
v. *Casey,* id. 393.)   The deposition of Edwards, read in evidence,
that on the morning of the homicide the prisoner had asked
him if pepper would blind a person by throwing it in their
eyes, and what they would do with him if it should happen,

was incompetent.   (*Moore* v. *Meercham*, 10 N. Y. 210 ; *Enos* v. *Tuttle*, 3 Conn. 250; 3 Russell on Crime [9th ed.], 278; *Dyson* v. *State*, 26 Miss. 362 ; *Hudson* v. *State*, 1 Cold. 355 ; *Wiley* v. *State*, id. 362 ; *Lightfoot* v. *People*, 16 Mich. 507 ; *Crop* v. *People*, 47 Ill. 152 ; *Kinchelow* v. *State*, 5 Hump. 9 ; *Thomas* v. *People*, 57 N. Y. 218 ; *Slater* v. *People*, 53 id. 164 ; *People* v. *Coleman*, id. 81.)   It was error to exclude the evidence offered that the father and brothers of the prisoner were the sub‑ jects of epilepsy and of strange conduct, tending to show that they were tainted with insanity. (*Baxter* v. *Abbott*, 7 Gray, 71; *Cole's Trial*, 7 Abb. Pr. [N. S.] 330, 331 ; 1 Wharton's Cr. Law, § 57 ; *Coon.* v. *Andrens*, 1 W. & S. Med. Jur., § 375; *Comm.* v. *Rogers*, 7 Metc. 500.)   The affirmative of the issue was upon the prose- cution and so remained until the end of the trial. (*People* v. *O'Connell*, Alb. L. J., Jan'y 17, 1882 ; *Brotherton* v. *People*, 75 N. Y. 159.)

*Isaac S. Catlin*, district attorney, for defendant in error.   There was no testimony even tending to show insanity or irresponsi- bility. (*Flanagan* v. *People*, 52 N. Y. 467 ; *Willis* v. *People*, 32 id. 715 ; *O'Brien* v. *People*, 36 id. 276.)   The exhibition of the photograph was part of the opening of the case, which is a mat- ter in the discretion of the court, and cannot be reviewed on an exception.   (1 Park. Cr. 147.)   The affidavit of Abraham H. Dailey, though entirely harmless, is no part of the record or bill of exceptions and will not be considered by the court. Nothing but the exceptions taken and appearing on the record can be reviewed. (*Stephens* v. *People*, 19 N. Y. 549 ; *People* v. *Dalton*, 15 Wend. 287 ; 17 id. 467 ; *People* v. *Finnegan*, 1 Park. Cr. 146 ; *Hunt* v. *People*, 76 N. Y. 89 ; *Steele* v. *Lyon*, 12 Conn. 487 ; § 37 [old § 25], of tit. 6, pt. 4, chap. 2 ; *Peo‑ ple* v. *Casey*, 72 N. Y. 393 ; 3 R. S. [6th ed.] 1038, art. 1 ; *Gaffney* v. *People*, 50 N. Y. 417 ; *Willis* v. *People*, 32 id. 715.)   When a person strongly resembling the accused was seen in the neighborhood of the alleged crime, it is strong evi- dence of identity. (*People* v. *Gonzales*, 35 N. Y. 49 ; *Comm.* v. *Cunningham*, 104 Mass. 545 ; Whart. and St. Med. Jur., vol.

2, § 12. 3; *Endon* v. *People*, 33 N. Y. 501 ; Wharton on Criminal Evidence, § 807.) The knife having been absolutely shown to have been the property and in possession of the accused, inquiry, therefore, about it was proper and material. (Wharton on Criminal Evidence, § 765 ; *Mundum* v. *Comm.*, 6 Rand. 704.) Evidence of the existence of any motive for the commission of the crime, or of expression of ill-feeling toward the deceased was admissible. (*Murphy* v. *People*, 34 N. Y. 590 ; *La Beau* v. *People*, id. 223 ; *People* v. *Cunningham*, 6 Park. Cr. 398 ; *State* v. *Wentworth*, 37 N. H. 196 ; *State* v. *Alford*, 31 Conn. 40 ; *Stephen* v. *People*, 4 Park. Cr. 396.) The relations and intercourse between the prisoner and deceased for months may be proven. (*Comm.* v. *Cortly*, 118 Mass. 1.) Jealousy and the ground for it may be proven. (Wharton on Criminal Evidence, § 784 ; *Nesbit* v. *State*, 45 Ga. 238 ; *Templeton* v. *People*, 27 Mich. 501 ; *People* v. *Hendrickson*, 1 Paige's Ch. 406 ; *McCue* v. *Comm.*, 78 Penn. St. 155 ; *McKee* v. *People*, 36 N. Y. 113 ; *Shorter* v. *People*, 4 Barb. 474.) Whatever fact fairly tends to prove the assumed motive is competent, though that fact be the subject of a distinct felony. (*People* v. *Stout*, 4 Park. Cr. 106 ; 1 id. 649, 655 ; American Criminal Law, 292 *et seq.;* Roscoe on Criminal Evidence, 81 *et seq.;* 19 Eng. Com. Law, 354 ; 1 Leading Crim. Cases, 189 ; *People* v. *La Beau*, 34 N. Y. 223 ; *People* v. *Mulatto*, 4 Dallas, 464 ; *People* v. *Gardiner*, 5 Park. Cr. 158 ; *People* v. *Thompson*, 41 N. Y. 6 ; 3 Greenl. 145 ; Wharton on Criminal Law, 635 ; *Coleman* v. *People*, 58 N. Y. 555, 560 ; *Cowley* v. *People*, 8 Abb. N. C. 1 ; 85 N. Y. 464.) The question to Father Keegan, "what he had noticed in reference to the conduct of the brother of the prisoner," was properly excluded, being neither competent nor pertinent. (43 N. Y. 464 ; *Queen* v. *Tuckel*, 1 Cox's C. C. 103 ; *O'Brien* v. *People*, 36 N. Y. 282, 284 ; *People* v. *Cole*, 7 Abb. [N. S.] 321 ; *People* v. *Real*, 42 N. Y. 270 ; *Clapp* v. *Fullerton*, 34 id. 190 ; *Sawyer* v. *State*, 35 Ind. 84 ; *Snow* v. *Benton*, 28 Ill. 307.)

ANDREWS, Ch. J. The plaintiff in error was convicted at a

court of Oyer and Terminer, in Kings county, of the murder of one Barbara Gronenthal, by stabbing with a knife, on the evening of January 3, 1881. The deceased was sixteen years of age, and at the time of her death was engaged in domestic service in Brooklyn. The prisoner was about nineteen years of age, and worked in a paint shop in that city. The deceased, a few minutes before the homicide, was seen standing in an area, under the steps of the house where she was employed, engaged in conversation with a man, and soon thereafter she was heard to scream, and she opened the basement door and entered the passage-way of the house and immediately fell, saying she had been stabbed, and in a few moments died. On examining her body a punctured wound was found on the left side of the chest, which appeared to have been made by a knife. The knife entered the body between the second and third ribs, and wounded the aorta, causing internal hemorrhage. A knife, covered with blood, was found in the area in front of the house, a short time after the occurrence.

That the homicide was committed by the prisoner was clearly established, and this fact was not controverted. The knife was shown to have belonged to the prisoner. On the morning of the homicide, he took it to a person employed in the same building where he worked and procured him to sharpen it, and requested him to "put a good point on it." On the same morning he asked one of his fellow-workmen where the heart was located, and opened his clothing with a view to having its position pointed out. He also, on the same morning, asked another workman if pepper thrown in the eyes would blind a person, and what would be done with him if any thing like this should happen, and was informed that he would be sent to the State prison. The people also proved declarations of the prisoner, made after his arrest, tending to identify him as the perpetrator of the act.

The motive of the prisoner was sought to be established by showing his relations to the deceased. It appeared that for several months before the homicide, the prisoner had paid his addresses to the deceased, but that during the last part of their

acquaintance she had not encouraged them. There was evidence tending to show jealousy on his part of attentions paid to her by others. It was proved that the prisoner, being asked after his arrest, "what he did it for?" replied, "she found out I was poor, and before I would see her going to any one else" — and then stopped, leaving the sentence incomplete. The prisoner was found about an hour after the homicide, in a canal, on Hamilton street, at a bridge crossing, clinging to the abutment of the bridge and calling for help. The night was very cold. He was taken from the water and afterward to the station-house. The only defense made was that of insanity. The questions presented arise upon objections taken during the course of the trial.

The district attorney, in opening the case, handed to the jury a photographic picture, and said it was a likeness of Barbara Gronenthal, who had been stabbed to the heart by the prisoner. The prisoner's counsel immediately arose and said, "I arise to take an objection to what has been and is being done. The district attorney has handed to the jury, for their inspection, what he says is a likeness of the deceased." The court thereupon said, "I don't know as an objection will lie in such a case as that. I cannot strike it out." The counsel replied, "It is an act to which we take an exception." It is claimed by the prisoner's counsel, that the district attorney had no right to exhibit the photograph to the jury. The exhibition of the photograph of a young girl, alleged to have been cruelly murdered, was, as is claimed, calculated to excite the pity of the jurors, for the unfortunate victim of the homicide, and correspondingly to excite their prejudice against the accused. It must be conceded, that the exhibition of the photograph was an extraneous act, not justified by any thing involved in the issue before the jury. The personal appearance of the deceased was unimportant in any legal aspect of the case, and the court, if its attention had been called to the matter in time, might very properly have interfered, to prevent the exhibition of the photograph to the jury. But the act of the district attorney, as the record discloses, was not authorized or

sanctioned by the court. Its attention was first called to the subject, after the photograph had been exhibited. The court in reply to the remonstrance of the prisoner's counsel, stated the obvious truth, that the objectionable act had been done and could not be recalled. The statute (2 R. S. 736, § 21), authorizes exceptions to be made by the defendant on the trial of an indictment to any decision of the court, and it is well settled that the right of review in the appellate court, is limited to exceptions so taken, and to errors appearing upon the face of the record. (*People* v. *Thompson,* 41 N. Y. 1; *Gaffney* v. *People,* 50 id. 416.) When justice has been perverted by practices, *dehors* the record, or the accused has been injured by any circumstance occurring on the trial, not the subject of legal exception, the remedy of the party aggrieved, is by motion for a new trial before the court in which the trial was had, or by appeal to the executive for the exercise of the prerogative of pardon. (*Willis* v. *The People,* 32 N. Y. 715.) The error book contains an affidavit of the prisoner's counsel, supplementing the record, by the statement that when the prisoner's counsel·made his objection to the exhibition of the photograph, the picture was then in the hands of a juryman in the front tier of the jury box, and was afterward examined by some of the jurors who had not before inspected it. The inference from the statement in the affidavit is, that the inspection by the other jurors was made during the colloquy between the counsel and the court. But we are of opinion, that if the court might have interfered and prevented the examination of the photograph by the jurors and omitted to do so, when its attention was called to the subject, it did not constitute legal error. The picture served no purpose, except to acquaint the jurors with the features and appearance of the deceased, and it is justly remarked by GILBERT, J., in his opinion, that if the jurors had known her, in her life-time, they would not for that reason have been disqualified as jurors. The extent to which counsel may go, in opening a case to a jury, cannot, in the nature of things, be regulated by precise rule. The court may doubtless interfere in the interest of jus-

tice to restrain undue license on the part of counsel in addressing the jury. It might, perhaps, be its legal duty to interfere, in a criminal case, where a prosecuting officer, under the guise of opening the case to the jury, should seek to prejudice them by the recital of facts proposed to be proved, which would be manifestly incompetent, if offered in evidence. But in general, the interference of the court must be a matter of discretion, the exercise of which is not the subject of exception. The exhibition of the photograph was, as we have said, an irrelevant proceeding. But it apprised the jury of no material fact; nor did the picture convey an impression of any material fact in the case. If the prosecuting officer, instead of exhibiting the picture, had described the deceased in terms calculated to excite the sympathy or pity of the jury, it would scarcely be claimed that an exception would lie to a refusal of the court to interfere. It is neither a logical nor a reasonable inference that a jury, dealing with the grave issue of life or death, in a case where the sole controverted question is, as to the insanity of the prisoner when he committed the act, would be influenced by a description in words, or by a representation in a picture of the personal appearance of the person alleged to have been murdered. Treating the affidavit of the prisoner's counsel as a part of the record, we think it furnishes no ground for a reversal of the judgment. It may be further observed that the first witness called was asked by the district attorney, " is that a picture of Barbara Gronenthal," and answered, without objection, in the affirmative. No other picture had been referred to, and it may fairly be assumed that the question and answer related to the photograph exhibited to the jury.

The counsel for the prisoner objected to the reception of the evidence given by a fellow workman of the conversation with the prisoner, on the morning of the day of the homicide, in respect to the throwing of pepper into the eyes of a person, and his inquiry as to what they would do with him if any such thing should happen. We

think the evidence was competent. The general principle is undeniable, that only such evidence is admissible as is relevant to the issue. The issue in the case of homicide, charged as murder in the first degree, involves an inquiry not only as to the commission by the prisoner of the act charged, but also whether it was committed with the deliberate and premeditated design to effect the death of the deceased, or under the impulse of sudden passion or other circumstances, which would reduce the grade of the offense, or constitute a justification. The proof that the prisoner, on the morning of the homicide, procured the knife to be sharpened, with which the killing was done, was competent evidence upon the question of deliberation and intent, and it was for the jury to determine upon all the competent evidence, tending to show deliberation, whether this element of the crime of murder in the first degree existed. The conversation in respect to the pepper tended to show that the prisoner was meditating the commission of a personal injury upon some one, and it was so proximately related to the other circumstances, and to the actual commission of the crime charged, that the jury would be authorized to infer that the prisoner was then meditating a personal injury to the deceased. The throwing of pepper was not the crime charged, but if the prisoner, in the morning, among other things, was considering an assault upon the deceased by the throwing of pepper, it was cumulative evidence of deliberation in respect to the crime actually committed.

Another point is made, in respect to the exclusion of a question put to the witness Keegan, as to what he had noticed in respect to the conduct of the prisoner's brother. Keegan was a priest, and was the first witness called for the defense. He had testified that the prisoner's father, who died thirteen years before the trial, had epileptic fits on several occasions, when the witness was present, and that on one occasion he saw him strike his head against a fence, as though he wanted to relieve it, and that he appeared to be in great distress of mind. The witness then testified that he knew the prisoner's brother, and was asked by the prisoner's counsel, if he had noticed any thing

at any time strange in his conduct.   The prosecuting attorney here interposed, saying, that he did not know whether they could go into the insanity of the whole family or not.   The court then said to the prisoner's counsel, "It is open for you to prove, that the father was afflicted with any disease of the mind, and afterward to prove such a disease hereditary, or may be hereditary.   The question is, whether this witness, is a competent witness on this subject."   The prosecuting attorney then said, "I will concede that the other members of the family, · have shown strange and unusual conduct."   The prisoner's counsel then asked the witness what he had noticed in reference to the conduct of the brother, and on the prosecuting attorney asking the court if this was competent, the question was excluded as incompetent, and the prisoner's counsel excepted.   The case shows, that up to the time when this question was asked, neither the insanity of the prisoner nor of any member of his family, had been shown, nor had any evidence been given, tending to show such insanity.   It had been shown, that the father was an epileptic, but it had not been shown, that epilepsy is a disease which affects the mind, or produces insanity, or that it is hereditary, and these were matters of fact to be proved by medical experts, and could not be inferred by the jury.   The evidence of Dr. Fowler, a witness for the prosecution, the physician who first saw the deceased after her death, and who was questioned on his cross-examination as to epilepsy, disclosed, that he had no knowledge on the subject, and his evidence did not tend to establish either of the facts referred to.   It was competent for the prisoner, to prove in aid and corroboration of other proof, or of circumstances, creating a presumption or tending to justify an inference of insanity at the time of the commission of the act, that he inherited a disease which predisposed him to insanity.   The insanity of parents, or relatives, is also admissible upon the issue of insanity.   It tends to show an hereditary taint, and supplements evidence of insanity of the accused.   When the question as to the conduct of the plaintiff's brother was asked, it had neither been shown that the father was insane, or

that the prisoner was afflicted with epilepsy or other disease. The conduct of the brother, as an isolated, independent fact, was wholly immaterial, and the question asked, did not necessarily point to evidence of insanity in him. We think the fair construction of the ruling of the court was, that the defense should first show that epilepsy is, or tends to produce, insanity, and that the disease is transmissible, before entering into the general subject of the conduct of the brother. It was a matter of the order of proof, within the discretion of the court. The prisoner subsequently gave medical evidence that epilepsy may produce insanity, and also that it is transmissible, and that the prisoner manifested epileptic symptoms, but he did not again offer proof in respect to the conduct of the brother. We think the exclusion of the question to the witness Keegan, was not, under the circumstances, legal error. We reach this conclusion with less reluctance, for the reason that on a careful examination of the evidence we cannot think that the prisoner was prejudiced by the ruling. The summary of the evidence given by members of the prisoner's family in support of the defense of insanity, contained in the prevailing opinion of the General Term, is justified by the record. " It was not shown that the prisoner had ever had an epileptic fit or seizure. He had frequently complained of lightness and pains in his head, he had expressed wishes that he was dead, and threats of suicide, and he was subject to melancholy moods. He was also often seen sitting up in his bed in the night, making signs with his hands, throwing them up over his head and talking to himself. Evidence was given that the prisoner's conduct on the evening of the homicide showed such or similar aberrations, but the attempt to prove that the conduct of the prisoner, as detailed by the witnesses, indicated insanity, failed." The medical expert called for the defense testified that the evidence indicated that the prisoner inherited a nervous organization, and this was the extent to which he was willing to go in the expression of an opinion as to his insanity. There are some minor exceptions. We have examined them with care but they do not, we think, present any serious question. They have been fully considered

in the careful opinion of GILBERT, J., at the General Term, and do not need any further elucidation.

We find no error in the record, and the judgment should therefore be affirmed.

All concur, except RAPALLO, J., absent.

Judgment affirmed.