# James v. The State.

## Murder.

(Decided June 17, 1915.   Rehearing denied July 2, 1915.
69 South. 569.)

1. *Homicide; First Degree; Evidence.*—To disprove existence of specific intent essential to constitute murder in the first degree, a defendant may show that he was so intoxicated at the time of the killing as to be incapable of understanding that he was committing a crime.

2. *Evidence; Opinion; Intoxication.*—It was not competent for a witness to testify that defendant was so intoxicated at the time of the killing as to be incapable of understanding that he was committing a crime, since that was a question to be determined by the jury.

3. *Homicide; Degree; Intoxication.*—Where defendant relied on intoxication at the time of the kililng as a defense, the fact that he offered a witness a drink shortly before the killing, was immaterial.

4. *Same.*—Where defendant relied on intoxication as defense for the homicide, the fact that he had been drinking at other times, did not show an incapacity to commit murder at the time of the killing, and questions as to his condition as to drinking on prior occasions, were not admissible.

5. *Same.*—A witness may not testify that he considered the defendant mentally unbalanced at that time, although such witness had testified that defendant was drinking, and acted queerly just before the offense.

6. *Same; Insanity; Evidence.*—Where defendant interposed his insanity as a defense to the killing, the fact that his mind had not been strong since he had had a fever a year before the killing, being the mere opinion of the witness, was not admissible.

7. *Same.*—A non-expert testifying to the insanity of a person must state what act of accused he had seen, and then give his opinion as to his sanity, but cannot testify that he has seen acts of insanity.

8. *Same.*—A witness cannot testify that while defendant is drinking his reason is dethroned, or that he then displays acts of insanity, or is not responsible for what he does.

9. *Same.*—The fact that a defendant on another occasion when drunk, was in such condition that no one could do anything with him, was irrelevant to the issues then being tried, and was properly excluded.

10. *Same; Intoxication as a Defense.*—Insane conduct or mania resulting from the present intoxication of defendant charged with

murder does not excuse the crime; and where there was no evidence to show any fixed insanity resulting from drunken habits or otherwise, the abnormal conduct and conditions of defendant as associated with his present drunkenness may not be shown.

11. *Evidence; Judicial Notice; Insanity.*—The courts judicially know as an established fact of medical science that many forms of insanity are inheritable, and may recur in various individuals collaterally descended from a common source.

12. *Homicide; Insanity; Evidence.*—Evidence of the insanity of one or more members of the family of defendant, immediate or collateral, is not admissible except in connection with other evidence directly showing that defendant is insane.

13. *Same.*—The fact that the mother of defendant, and a maternal aunt had been sent to the asylum, may not be shown as to the insanity of defendant where it was not shown what sort of an asylum they were sent to or why they were sent, and what their mental condition was at the time.

14. *Same.*—Opinions of witness acquainted with the relatives of the defendant that insanity runs in the family, are mere conclusions and not admissible.

15. *Same.*—The mere fact that a maternal aunt of defendant is insane and confined in an insane asylum, cannot be shown in support of the defense of insanity when not accompanied by any evidence of the nature, extent, duration or symptoms of her mental disorder.

16. *Same.*—The fact that defendant was at the time of the killing so mentally unbalanced as not to know the consequences of his act, is not of itself a palliation of murder, under a plea of not guilty; nor an excuse therefor under a plea of insanity.

17. *Same; Instructions.*—A charge that if the jury believe that at the time defendant shot deceased, his conducts and acts were such that he was so mentally unbalanced that he did not know the consequences, that fact could be considered in determining the verdict, was properly refused as being misleading and singling out evidence without stating any proposition of law.

18. *Same.*—A charge that evidence that defendant was intoxicated at the time, was admitted as bearing on the question of premeditation and deliberation, and if, after consideration of the facts, the jury have a reasonable doubt of defendant's guilt, they must acquit him, is misleading in its suggestion of acquittal because of intoxication, while under the evidence there could be no acquittal on the plea of not guilty.

19. *Same.*—A charge requiring an acquittal of murder in the first degree, if the defendant was so drunk or mentally unbalanced as to cause him to turn a deaf ear to reason, was refused without error.

20. *Charge of Court; Reasonable Doubt.*—A charge requiring an acquittal of defendant if the evidence leaves in the minds of the jury any reasonable doubt of his sanity, was properly refused.

21. *Homicide; Intoxication; Evidence.*—Where there was evidence of the drunkenness of defendant, its probable degree may be illustrated by showing that it was immediately preceded by protracted

[James v. The State.]

and heavy drinking, although proof of the latter fact alone does not prima facie show that it was in fact followed by any degree of drunkenness or insanity at the time of the commission of the offense charged.

22. *Same; Insanity.*—Where the defense relied on insanity produced by intoxication, whether the defendant looked natural or unnatural just before the commission of the offense, cannot be proved to show insanity, although a witness observing a facial expression, is generally allowed to say that it indicated any of the ordinary and familiar mental emotions, or physical sensations.

APPEAL from Cullman Circuit Court.

Heard before Hon. D. W. SPEAKE.

George James was convicted of murder in the first degree, and he appeals. Affirmed, and the application for rehearing denied.

Aside from the general issue, defendant also interposed the plea of not guilty by reason of insanity. Defendant was 18 years of age at the time of the killing, and the undisputed evidence shows that he entertained sentiments of hostility toward deceased, and that he killed him at night with a shotgun furtively fired through a window, while deceased was in his own home and seated in the midst of his family.

The state's witness Aaron testified on the cross-examination that defendant was at witness' house just before the murder; that he was drinking, and had a bottle of whisky, but he could not say he was drunk—he could walk straight, and he smelt whisky on his breath. The trial judge excluded defendant's question: "Did he offer you a drink?" The witness further stated that he had known defendant for 10 years, and that prior to the killing, and shortly before that occasion defendant passed him several times and looked like he had been drinking. The trial judge then excluded the following question: "What was his condition with reference to whether or not he had been drinking?" "Had he not been drinking pretty heavily for several days

prior to the killing?" "Tell the jury whether or not (just before the killing) in your opinion, the defendant was so much intoxicated as to be wholly unconscious of his acts." "And tell the jury, in your opinion, whether you considered him (at that time) mentally unbalanced."

The state's witness McCoy testified on cross-examination that he did not see defendant on the day of the killing, but had seen him frequently before that, and that he was well acquainted with the family of the mother of defendant, the Higginbothams. The trial judge then excluded these questions: "Insanity runs in the Higginbotham family doesn't it?" "The defendant's mother and sister were sent to the asylum, were they not?" "On other occasions, when he was drunk, was he so drunk as to be unconscious?"

Defendant's father testified for him that defendant had a spell of fever the year before, and also that he drank a good deal. The trial judge then excluded the following questions asked by defendant: "Since that fever, has his mind been very strong or not?" "Since that fever, have you seen any acts of insanity?" "While in that condition [drinking]: (1) Is his reason dethroned? (2) Does he display any acts of insanity? (3) Is he responsible for what he does?"

Defendant's mother testified for him that she was present "Christmas a year ago" when he and his father had some trouble, and defndant was drunk, wild as a bear, and, further, that nobody could do anything with him like he is when he is drinking; affects his mind; don't know anybody." The judge excluded the expressions, "no one could do anything with him," and "affects his mind." The witness further stated that defendant nearly died the year before, and was in bed

three weeks with a spell of fever. The court then excluded the following question asked by defendant: "What was the condition of his mind after he got up?" He also excluded questions as to whether insanity ran in witness' family, and whether his sister is not now insane, and confined in the lunatic asylum at Tuscaloosa.

The following charges were refused to defendant:

(1) "If you believe from the evidence that at the time the fatal shot was fired by defendant that his conduct and acts were such that he was so mentally unbalanced or insane that he did not know the consequences, then you should take such into consideration in determining your verdict."

(2) "If you believe from the evidence that although you believe beyond all reasonable doubt that defendant is guilty of murder in the first degree, yet if you believe from the evidence that defendant was so mentally unbalanced that he did not know the consequences of his act, you should find him not guilty."

(3) "Evidence that the accused was intoxicated at the time of the killing, if you find such evidence has been offered in this case, is admitted for your consideration as bearing on the question of premeditation and deliberation; and if after a careful consideration of all the facts and circumstances in the case you have a reasonable doubt of defendant's guilt, you should find him not guilty."

(4) "If you believe from the evidence that, at the time the alleged fatal shot was fired by defendant, he was drunk or mentally unbalanced to such an extent as to cause defendant to turn a deaf ear to reason, you should not convict defendant of murder in the first degree."

(5) "While defendant is required to prove that he was of unsound mind at the time of the homicide by the preponderance of the evidence, it is also true that upon the consideration of the testimony of the whole case, the state's as well as the defendant's, if any reasonable doubt remained in the minds of the jury, the verdict should be not guilty."

(6) "The legal presumption of sanity may be overcome by evidence tending to prove insanity of the accused, which is sufficient to raise a reasonable doubt of his sanity at the time of the commission of the act for which he is sought to be held accountable; but when that is done the presumption of sanity ceases, and the burden is upon the state, which is then required to prove his sanity, as an element necessary to constitute crime, beyond a reasonable doubt."

DANIEL W. TROY, TALBERT LETCHER, P. M. BRINDLEY, and C. L. PRICE, for appellant.

W. L. MARTIN, Attorney General, and J. P. MUDD, Assistant Attorney General, for the State.

SOMERVILE, J.—(1, 2) It was competent for the defendant to show that he was intoxicated to such a degree as to render him at the time of the killing incapable of understanding that he was committing a crime; this for the purpose only of disproving the existence of the specific intent or mental state which is an essential ingredient of murder.—*Waldrop v. State,* 185 Ala. 20, 64 South. 80; *Walker v. State,* 91 Ala. 76, 9 South. 87. But it was not competent for defendant's witnesses to testify that his intoxication produced that result, since that was a conclusion to be drawn by the jury from the evidence.—*Armor v. State,* 63 Ala. 173.

(3-5) The fact that defendant offered the witness Aaron a drink before the killing was not material, and was properly excluded. And the mere fact that he had been drinking at other times had no tendency to show his incapacity to commit murder on the occasion in question; hence the questions to Aaron as to defendant's condition with reference to whether he was drinking on prior occasions were properly excluded. But the ruling was harmless in any case, as the witness had already testified that defendant looked like he was drinking. It may be that, had defendant offered to show that he had been "drinking pretty heavily for several days prior to the killing," with the explanation that he proposed to show fixed insanity as a result of long-continued drunken habits; this would have been competent as a link in such a chain of proof. But this purpose did not appear. Upon the predicate merely that defendant was drinking and acting queerly just before the killing, the trial judge properly refused to allow this witness to say whether he considered him "mentally unbalanced" at that time.

(6, 7) That defendant's mind had not been "very strong" since he had the fever the year before was obviously a mere opinion of the witness (defendant's father), and was of no probative value upon the issue of insanity vel non. Its exclusion was proper. Nor could the witness state that he had seen "acts of insanity" since the fever. He should have stated what acts of defendant he had seen, and then he might properly have given his opinion as to his insanity.—*Rembert v. Brown,* 14 Ala. 360.

(8) So it was not permissible for this witness to state that while defendant is drinking his reason is dethroned, or that he displays acts of insanity, or that

he is not responsible for what he does.—*Heninburg v. State,* 153 Ala. 13, 45 South. 246. Even if general results, thus drawn by the witness from other occasions, were relevant, these were conclusions to be drawn by the jury and not by the witness.

(9) The fact that on another occasion when defendant was drunk nobody could do anything with him was clearly irrelevant, and was properly excluded.

We have examined with due care all of the excluded testimony offered by defendant to show incapacity to commit murder, or to support his plea of insanity. In every case it was properly excluded, either because it related to irrelevant occasions, or was inadmissible opinion, or because the witness giving his opinion omitted the necessary predicate of facts, or was not sufficiently qualified by observation and knowledge.—*Parrish v. State,* 139 Ala. 28, 42, 36 South. 1012; *Dominick v. Randolph,* 124 Ala. 557, 564, 27 South. 481; *Odom v. State,* 174 Ala. 4, 56 South. 915; *Heninburg v. State,* 153 Ala. 13, 43 South. 246.

(10) In this connection it is to be noted that insane conduct or mania resulting merely from present intoxication is not the insanity which excuses crime.—*Gunter v. State,* 83 Ala. 96, 109, 3 South. 600; *Parrish v. State,* 139 Ala. 47, 36 South. 1012; Buswell on Insanity, 449. All of the alleged abnormal conduct and conditions of defendant, offered to be shown by the several witnesses, were directly associated with present drunkenness, excepting only the instance of fever above referred to. So there was in fact no evidence before the court tending to show any fixed insanity, resulting from drunken habits or otherwise.

(11) In some of the early cases it has been held that proof of insanity among the relations of the defendant is admissible only in connection with expert testi-

193. OF ALABAMA. 63
[James v. The State.]

mony that insanity is in fact hereditary.—*Regina v. Tuckert,* 1 Cox. C. C. 103; *State v. Simms,* 68 Mo. 305. We think, however, that courts must now judicially know, as an established truth of medical science, that many forms of insanity—or, at least, the physical and neurotic conditions which tend to produce or invite such forms—are transmissible from parents to children, and may recur in the various individuals collaterally descended from a common source.—*People v. Garbutt,* 17 Mich. 9, 97 Am. Dec. 162, and note, 174; *Baxter v. Abbott,* 7 Gray (Mass.) 71, 81.

(12) But, while evidence of the insanity of one or more members of the defendant's family, immediate or collateral, is admissible to show the hereditary taint in his own blood, such evidence is never admissible, except in connection with other evidence directly tending to show that the defendant is himself insane.—*State v. Cunningham,* 72 N. C. 469; *Laros v. Com.,* 84 Pa. 200, 209; *State v. Van Tassel,* 103 Iowa, 11, 72 N. W. 497; *Watts v. State,* 99 Md. 30, 57 Atl. 542; *People v. Smith,* 31 Cal. 466; *Murphy v. Com.,* 92 Ky. 485, 18 S. W. 163; *Snow v. Benton,* 28 Ill. 306; *Guiteau's Case,* (D. C.) 10 Fed. 161, 167; Whart. & Stille's Med. Jur. § 377; Clev. Med. Jur. of Ins. 528. For, as said by Bynum, J., in *State v. Cunningham, supra:* "To allow such evidence to go to the jury as independent proof of the insanity of the prisoner would be of the most dangerous consequence to the due administration of criminal justice, since there are but few persons, it is ascertained, who have not had ancestors or blood relations, near or remote, affected by some degree of mental aberration."

But, independently of this consideration, the questions by which defendant sought to show hereditary insanity were either inapt or legally objectionable.

[James v. The State.]

(13) The fact that defendant's mother and a maternal aunt "were sent to the asylum," there being nothing to show what sort of asylum they were sent to, why they were sent, and what was their mental condition at the time, was patently inadmissible.

(14) So, also, the opinions of witnesses, however well acquainted they might be with defendant's maternal relatives, that "insanity runs in the family," were utterly incompetent, not only because they were mere conclusions, but because the witnesses were not qualified to give their opinions on such a subject.

(15) Defendant offered to show by his mother that her sister is "now insane, and confined in the lunatic asylum at Tuscaloosa." It may be that the bare fact that a parent of the defendant is insane and under confinement on that account would be admissible as tending to show hereditary insanity in the defendant, which however, we need not now decide; but we think the bare fact that a maternal aunt is insane, and confined in an insane asylum, without any evidence to show the nature, extent, duration, or symptoms of her mental disorder, and nothing to suggest that it has arisen from causes or conditions which are transmissible, as distinguished from those which are purely personal or ephemeral, does not furnish any rational basis upon which the jury could infer the existence of hereditary insanity in the family of defendant.

"It is doubtless the general and well-established rule, that, where the mental soundness of an individual is in question, the sanity of the blood relations in the ancestral line may be shown as tending to establish the fact in issue (*Walsh v. People*, 88 N. Y. 458) ; but that rule does not permit indiscriminate and unexplained evidence of diseases afflicting such relations and af-

fecting their mental faculties. There must be evidence tending to show at least that such diseases are hereditary or transmissible.—*Reichenbach v. Ruddach,* 127 Pa. 564, 18 Atl. 432; *State v. Van Tassel,* 103 Iowa 6, 72 N. W. 497; * * * It is a scientific fact of common knowledge that the transmissibility of the malady known as 'general paresis' depends to a great extent upon the conditions underlying the disease. * * * Whether the particular form of the disease from which the testatrix and her family suffered was of such a transmissible character that she might be said to have derived it from her ancestors cannot be determined from the evidence in the record, and it is therefore difficult to see how the testimony of the physicians (that her mother and brother were afflicted with general paresis) was really pertinent to the issue whether the testatrix was possessed of testamentry capacity."—*Matter of Myer,* 184 N. Y. 54, 76 N. E. 920, 6 Ann. Cas. 26, and note collecting the authorities.

(16, 17) Charge 1, refused to defendant, instructs the jury that if, "at the time the fatal shot was fired by the defendant, his conduct and acts were such that he was so mentally unbalanced or insane that he did not know the consequences, then you should take such into consideration in determining your verdict." The fact that one who kills is at the time so mentally unbalanced as not to know the consequences is not per se a palliation of murder under the plea of not guilty, nor is it an excuse therefor under the plea of insanity. A man's mind may be temporarily unbalanced by fear, or hatred, or other causes, not associated with mental disease; and equally the most intelligent and responsible man may not perceive all the consequences of his act. Neither of these phrases is apt, and the

charge could only have misled and confused the jury. Moreover, it is objectionable as singling out evidence for the consideration of the jury, without stating any proposition of law.

Refused charge 2 requires a verdict of not guilty if defendant "was so mentally unbalanced that he did not know the consequences of his acts," and was properly refused for reasons just above stated. The legal tests of criminal irresponsiblity by reason of insanity have been frequently stated and applied in accordance with the leading case of *Parsons v. State,* 81 Ala. 577, 2 South. 854, 60 Am. Rep. 193, and we need not now restate the law. However, this charge was fully covered by defendant's given charge 4.

(18) Refused charge 3 is palpably misleading in its suggestion of complete acquittal because of defendant's intoxication. On the undisputed evidence there could be no acquittal on the plea of not guilty.

(19) Refused charge 4 required an acquittal of murder in the first degree, if the defendant was so drunk or mentally unbalanced as "to cause him to turn a deaf ear to reason." Its refusal was proper, and needs no comment.

(20) Refused charges 5 and 6 require the acquittal of defendant, if the evidence leaves in the mind of the jury any reasonable doubt of his sanity. This is not the law in this state, and these charges could not be properly given.

An examination of the entire record discloses no error of law of which defendant can complain, and the judgment must be affirmed.

Affirmed. All the Justices concur.

ON REHEARING.

SOMERVILLE, J.—We have examined with due care the several questions now urged for our reconsidereration.

(21) 1. It must be observed that, at the stage of the trial when the court excluded the defendant's question to the state's witness Aaron, "Had he not been drinking pretty heavily for several days previous to the killing?" there was no testimony before the court that defendant was drunk in any degree on the day of killing, nor at any other time. It is, of course, to be conceded that, when there is evidence of drunkenness, its probable degree may be illustrated by showing that it was immediately preceded by protracted and heavy drinking, yet proof of the latter fact alone does not even prima facie show that it was in fact followed by any degree of drunkenness or insanity.—See *Snead v. Scott,* 182 Ala. 97, 62 South. 36; and *Sharp v. State, infra,* 69 South. 122. Had this question been propounded at a later stage of the trial, it might have been error to exclude it.

2. For the same reason the defendant's condition "relative to drinking" on several occasions shortly preceding the killing, but disconnected therewith in continuity, was, when sought to be elicited from this witness, prima facie irrelevant. Moreover, though the meaning of this question is somewhat obscure, we are satisfied, as already stated, that it had been already fairly answered, to the extent of the witness' knowledge, by his statement that on these occasions "he seemed to be drinking."

(22) 3. While mental emotions, as well as physical sensations, are usually exhibited by facial expressions,

and, when relevant, a witness who observed a person's facial expression is generally allowed to say that it in- dicated any of the ordinary and familiar mental emo- tions or physical sensations which common knowledge informs us may be thus visibly indicated (*Stone v. Watson,* 37 Ala. 279; *Carney v. State,* 79 Ala. 17; *Long v. Seigel,* 177 Ala. 338, 58 South. 380; *Barlow v. Ham- ilton,* 151 Ala. 634, 44 South. 657, and cases cited), yet the question of whether a person looked natural or un- natural does not come within the reason of that rule. Any one of a hundred things might cause a person to look unnatural, without in any way evidencing an in- sane mental condition. Such an opinion by this wit- ness was, at least upon the issues here involved, too vague and too conjectural as to its significance to be of any material probative value.

We are impelled to adhere to our conclusions on the original hearing. All the Justices concur.