CLAUDE GRAHAM, BY HIS NEXT FRIEND, W. H. GRAHAM, v. THE SANDHILL POWER COMPANY.

(Filed 8 April, 1925.)

**1. Evidence—Nonexpert Witnesses—Collective Facts—Electricity.**

Where there is evidence tending to show that defendant electric power company was negligent in the construction of transmission lines, uninsulated, near the top of a sawdust pile, where children were accustomed to play, and that the plaintiff was injured thereby, a boy of 15 years of age, it is competent for an expert in such matters to testify, from his own observation of the plaintiff, that he was only of the mentality of a boy 8 or 10 years of age, relative as to whether he should have been aware of the dangerous circumstances under which he had voluntarily acted at play, and which produced the injury, and that such low mentality was hereditary in his family. *Semble,* a nonexpert witness may likewise testify from his own observation as to the boy's mentality.

**2. Evidence—Appeal and Error—Harmless Error.**

Where there is evidence tending to show that the plaintiff, 15 years of age, and immature for his age, was injured by the negligence of the defendant electrical power company in stringing its uninsulated high-power lines near the top of a sawdust pile, where boys were accustomed to play, the admission of testimony of the plaintiff's father, after he had said the plaintiff had previously told him he was at play on the sawdust pile, but that afterwards the plaintiff told him he could not remember this circumstance, is not reversible error, when the trial judge instructed the jury they must disregard the plaintiff's own testimony as to his playing on the sawdust pile when he had received the shock causing the injury complained of.

**3. Evidence — Electricity — Burns—Opinion Evidence—Nonexpert Witnesses.**

In an action to recover for the negligent injury caused the plaintiff from the power line of an electric company carrying a high voltage of electricity, it is competent for a witness to testify, from his own observa-

tion, that the injuries he had observed on the plaintiff, after the accident, had been caused by burns from highly electrically charged wires, though he may not have proved that in this respect he could give an expert opinion.

**4. Electricity — Negligence — Contributory Negligence—Evidence—Non-suit.** .

In an action to recover damages of the defendant electrical company, caused by its negligent stringing of its highly charged wires, there was evidence in plaintiff's behalf tending to show the plaintiff was a lad 15 years of age, of the mentality of a boy 8 or 10 years old, and came in contact with the defendant's uninsulated wires, strung some three months before, a few feet above the top of a sawdust pile, where the boys of a rural district were in the custom of playing, and of which the defendant had either actual or constructive notice: *Held*, companies of this character are held to the highest degree of care not to cause injury to others, and the evidence was sufficient to take the case to the jury upon the issue of defendant's actionable negligence and plaintiff's contributory negligence, and to deny the defendant's motion as of nonsuit.

APPEAL by defendant from *Calvert, J.,* and a jury, November Term, 1924, of HOKE.

Claude Graham, a minor, by his next friend, his father, W. H. Graham, brings this action against the defendant for personal injuries sustained by the alleged negligence of the defendant. The defendant owns an electric plant at Lakeview, in Moore County, and owned and operated an electric transmission line extending from its plant across a portion of Hoke County to the State Sanatorium. The electric current was transmitted on uninsulated wires and carried 11,000 voltage. The line was 7 miles long, and constructed about 1 February, 1923. The wires were put on poles about 132 feet apart, three wires, and the current turned on about 15 February, 1923. The plaintiff was injured 23 April, 1923, in less than three months. In the construction of the line, the low wire was 19 feet from the ground. The two lower wires transmitting the current are about 18 inches apart, and a third wire about 18 inches almost above the center of the two lower wires. The wires were strung on brackets on the poles.

The allegations of the plaintiff are that the electric current transmitted over the line was of high, dangerous and deadly voltage, capable of producing death or great bodily harm; that on or near the Gillis land there had been a sawmill and a large quantity of sawdust had been piled up, 15 or 20 feet high; that the defendant well knew, or by the exercise of reasonable care ought to have known, that plaintiff, Claude Graham, and other children in the community were accustomed to use the sawdust pile as a place to play; that defendant, with gross carelessness and negligence, erected its transmission line within 2 or 3 feet above the top of the sawdust pile, within close proximity

to any children who might play on the sawdust pile; that the trans-
mission line was uninsulated and defendant transmitted thereon a
high and dangerous voltage of electric current; that defendant negli-
gently and carelessly used and operated the wires and line on 23 April,
1923; that the said Claude Graham, the plaintiff, about 15 years
old, was an illiterate and ignorant negro boy, not informed of the
deadly peril of the electricity transmitted over the wires; that while
playing with other boys on the sawdust pile, on said date above men-
tioned, without any fault on his part, he came in contact with the said
wires, carrying a high and dangerous voltage of electric current, and
was seriously and permanently injured. "The plaintiff's feet were
buried in the damp sawdust, and the electric current, being transmitted
by the defendant over the said wires, was grounded through the body
of the said plaintiff; that the said plaintiff hanged on the said wires
by his neck for some time, until the wires had burned their way to the
bone of his neck and head, and until one of his shoes was burned off
and his right leg and foot so badly burned that it was necessary for the
same to be amputated just below the knee; that the carelessness and
negligence of the defendant in constructing and operating the said
transmission line and uninsulated and unprotected wires, as aforesaid,
was the sole, proximate cause of the injury and suffering of the said
Claude Graham."

The defendant admitted that it was "engaged in the business of gen-
erating, transmitting and selling electric current, and was so engaged on
23 April, 1923. It is further admitted that said defendant company
transmits its electric current by means of the usual mode of transmis-
sion used by such companies for such business." It also admitted that
"on 23 April, 1923, the said defendant was engaged in transmitting
electric current over its transmission line extending across a portion of
Hoke County, said current being transmitted from its plant towards
Sanatorium, N. C." All other allegations of the complaint were denied.
As a further defense the defendant alleges "that the electric line referred
to in the complaint, erected to Sanatorium from defendant's power plant,
was erected by the defendant over the lands embraced in Camp Bragg
territory, under and by virtue of a lease by the Government of the
United States to the defendant, said line being erected in the usual
manner that all such lines are erected and operated by electric com-
panies, with all precautions taken for the protection of conditions that
might arise in connection therewith; that if the plaintiff, Claude Gra-
ham, was injured by reason of coming in contact with said wires, it was
on account of his own negligence and carelessness, and not on account
of any act of this defendant; and that if the plaintiff, Claude Graham,
was injured by the electric line of this defendant, he was a trespasser

upon the property of the defendant and was at the time at a place he had no right to be, and his injury, if any, was caused by his own negligent and careless act in trespassing on defendant's property and on property of Fort Bragg, and in that said plaintiff carelessly, negligently and purposely brought his body in contact with the wires of the defendant, which had been properly constructed and erected and maintained, as hereinbefore alleged, which wrongful and unlawful trespass of the plaintiff, and his careless and negligent act in putting his body in contact with the wires and property of the defendant, contributed to and was the proximate cause of his injury."

In the case on appeal it was agreed that the complaint was so amended as to show Claude Graham was below normal, mentally, and defendant's counsel announced in open court, when objecting to the testimony of Dr. Brown and others as to plaintiff's mental condition, that the objections were not based on any failure of plaintiff to allege a subnormal mental condition in his complaint, since it had agreed at the prior August term that this allegation need not be put into the complaint.

The usual issues of negligence, contributory negligence, and damages were submitted to the jury, and found in favor of plaintiff. The damages awarded plaintiff were $1,500.00.

From the judgment rendered, defendant appealed and assigned error. There are sixty-eight exceptions and assignments of error in the record. The material ones and other necessary facts we will consider in the opinion.

*W. H. Weatherspoon and J. W. Currie for plaintiff.*
*Smith & McQueen and H. F. Seawell for defendant.*

CLARKSON, J.  This cause was tried, upon the part of the plaintiff, upon the theory that plaintiff was hurt while playing, as a child, with other children, on top of a sawdust pile, on Sunday, 23 April, 1923. The defendant constructed its transmission line 2 or 3 feet from the top of the sawdust pile, where it knew, or by the exercise of reasonable care and prudence ought to have known, that children were in the habit and accustomed to play.  Plaintiff, while playing, came in contact with the "live wire" of defendant near the pile and was seriously injured.

There were numerous families living in the neighborhood, and plaintiff and other boys were accustomed to go there and play on the sawdust pile.  The sawdust pile was a few yards from a neighborhood road.  The wires were close to and in easy reach of the children playing on the sawdust pile, which was 15 or 20 feet high.

The theory of defendant was that the plaintiff, after being warned by his companions not to do so, deliberately undertook to test out the effects of the wires, and purposely jumped from the top of the sawdust pile to the wires, catching and coming in contact with at least two or three of the wires, causing a short-circuit through his hand and neck until, when the weight of his body had sagged the wires sufficiently, his right foot touched the sawdust pile, causing the electric current to pass through his right side into the ground, burning his foot at the point of exit. That the wires were set out of reach, some 10 or 12 feet from any point on the sawdust pile, and plaintiff, to come in contact, had to jump to catch the wires. That defendant did not know that children played around the sawdust pile, and had no reason to suppose they played there. That the nearest house was about one-quarter of a mile away, and the plaintiff and other boys lived as much as three-quarters of a mile away.

The evidence was in conflict as to where the sawdust pile was located, whether on the Duncan Gillis land or Fort Bragg territory. There is no evidence in the case that plaintiff trespassed on any land of defendant, nor was there any evidence in the case that the sawdust pile was on defendant's land or right of way. From the facts in this case, we do not think this material.

. Defendant's first group of exceptions and assignments of error is to the testimony of Dr. G. W. Brown, a medical expert. This testimony was to the effect that plaintiff was mentally below normal; that he had inherited insanity. The plaintiff was 15 years old when he was injured. The medical expert went so far as to say that plaintiff "hasn't the mind of a boy over 8 or 10 years old." We think this evidence material and competent, and the fact that he had inherited insanity also competent as corroborative of the main fact that plaintiff was mentally below normal.

In *S. v. Cunningham,* 72 N. C., 474, "The prisoner, in his defense, relied upon the plea of insanity, and to establish it gave in evidence that some of his uncles and aunts were insane, but the case states that 'there was no testimony whatever that the prisoner had exhibited signs of insanity,' and the testimony, which is made a part of the case, fully bears out the statement just quoted. When a foundation is laid by *some* evidence tending to show insanity in the prisoner, it is held admissible in corroboration, and as an additional link in the chain of circumstances to give in evidence, a hereditary taint in the blood, of a like malady." We think the foundation was laid, the *"plaintiff was mentally below normal,"* for the corroboration of hereditary taint.

It is well settled law that "The inference of a medical practitioner is frequently and favorably invoked with regard to questions relating to

25—189

mental condition." The Modern Law of Ev. (Chamberlayne), Vol. 3, part sec. 2006. 11 R. C. L., p. 603, sec. 29.

The mental condition may be shown by persons who are not experts, but who have had opportunities for observing and have observed the person.

In *White v. Hines,* 182 N. C., p. 279, this Court said: "The defendants contended that testimony to the effect that he 'was crazy,' or 'not normal,' was the statement of a positive conclusion or fact, and, for this reason, incompetent. But in this jurisdiction it is established that a nonexpert witness, who has had conversations and dealings with another, and a reasonable opportunity, based thereon, of forming an opinion as to the mental condition of such person, is not disqualified on the ground that his testimony is a mere expression of opinion. *McLeary v. Norment,* 84 N. C., 235; *In re Stocks,* 175 N. C., 224; *In re Broach,* 172 N. C., 522. One not an expert may give an opinion, founded upon observation, that a certain person is sane or insane. *Whitaker v. Hamilton,* 126 N. C., 470; *Clary v. Clary,* 24 N. C., 78."

The next group of exceptions and assignments of error by defendant is to the fact that plaintiff, at the trial, testified that he was hurt playing on the sawdust pile, when in fact he said, the day he was hurt, "The last I can remember is when I was there at Uncle Jack Watson's." This was before he was hurt. This testimony was stricken out by the court below and the jury instructed not to consider it. Defendant, in its brief, says: "Later, William H. Graham, father of the plaintiff, was questioned by plaintiff's counsel, and testified that 'I asked him (plaintiff), and he said he was just playing on the sawdust pile, but how it happened he didn't know.'"

Defendant contends that this evidence was very material to plaintiff and prejudicial to defendant. It sustains plaintiff's theory of the injury and contradicted the defendant's.

On this group of exceptions the full testimony necessary to be considered of the father is as follows:

"Q. Had Claude returned home on Sundays at other times and told you that he and the boys had been playing on this sawdust pile? Answer: 'Yes, sir.'

"Q. What did he tell you? Answer: 'He told me they had been playing down there in the sawdust pile.'

"Q. Now, Graham, have you tried to find out from Claude as to how this matter happened? Answer: 'Yes, sir.'

"Q. What did he tell you? Answer: 'He said he couldn't remember. I asked him, and he said he was just playing on the sawdust pile, but how it happened he didn't know.'

"Q. Did he say anything else about going there—anything in connection with it? Answer: 'No, sir; he said he didn't remember going there. It seemed that that day he can't remember nothing. But he remembered going there at different times before, but it seemed like from the shock he couldn't remember.'"

From the entire testimony we cannot hold it prejudicial. The fact that at other times on Sundays plaintiff and the boys played on the sawdust pile was some evidence going to fix defendant with notice that the pile was a play-place. The father, although saying that plaintiff said "he was just playing on the sawdust pile," follows this with the positive statement, "No, sir; he said he didn't remember going there," etc.

The next group of exceptions and assignments of error of defendant: Dr. G. W. Brown, introduced by plaintiff, was admitted by the defendant to be a medical expert. This witness was permitted, over defendant's objection, to testify as follows:

"Q. From the examination made by you of the boy, Claude Graham, and the condition you found him in, have you an opinion satisfactory to yourself as to whether or not he caught hold of a live wire with either one or both of his hands? Answer: 'I have an opinion; I don't think he grabbed the wire; I think that hand just barely touched the wire—his right hand."

Dr. Brown attended the boy, examined and treated him, and gave in detail his injuries. He gave it as his opinion that the condition came from burns; saw a print of wire across his neck—and that he was burned by a live wire.

The court asked Dr. Brown if he had any opportunity for observation of matters of this kind—burns by electricity. He answered, "Very little—not very much." He was asked by the court if he had opportunity to observe conditions before; he answered, "I have seen a few cases." The court then asked witness, "And you have an opinion satisfactory to yourself sufficient to answer the last question?" Answer: "Yes, sir."

Then the question and answer, which defendant particularly objected to, above set forth, was asked and answered. We can see no error under the facts and circumstances of this case to the questions and answers.

"A large class of cases embracing statements as to the probability or the possibility of an event, the capacity or tendency of an act or a machine, *the cause or the effect of a fact* (italics ours), may fairly be grouped together, because the reason why the opinion rule is urged against them is in general that the thing to which the witness testifies is not anything which he has observed, but is a quantity which lies in

estimate only and is the result of a balancing of concrete data. This is no sufficient reason for excluding such statements, because it must almost always be impossible for a witness to reproduce in words absolutely all the detailed data which enter into his estimate, and there can be no danger in receiving such an estimate from a competent witness." 4 Wigmore on Evidence (2 ed.), sec. 1976.

In S. v. Clark, 34 N. C., p. 151, it was held competent for a physician to give his opinion how a wound had been made. "Whether the skin of the throat under the chin of the deceased was cut by a sharp instrument or torn." The physician had not seen the body, but heard the evidence on the trial.

In S. v. Wilcox, 132 N. C., 1120, it was held competent for a physician to state the cause of a wound. S. v. Morgan, 95 N. C., p. 641. In the above cases the witnesses were experts.

In S. v. Skeen, 182 N. C., 844, it was held competent for a nonexpert witness to testify as to his opinion, "His clothes were damp—shoes muddy—looked like; didn't look like they had been unlaced for several days."

The real controversy in the case is on the motion of defendant as of nonsuit at the close of all the evidence. It is well settled in this jurisdiction that on this motion the evidence must be considered in the light most favorable to plaintiff.

There was evidence sufficient to be submitted to the jury that the defendant knew, or by the exercise of reasonable care ought to have known, that children in the community were accustomed to use the sawdust pile as a place to play, and there were numerous families in the community. It is admitted on all the evidence that defendant had a uniform height—19 feet from the ground—to string on the poles the wires carrying 11,000 voltage of electric current, and had fixed this as a safe height to carry so dangerous and deadly voltage. Defendant could have constructed its line easily with a small cost some distance from the sawdust pile, but, according to plaintiff's evidence, it was constructed within 2 or 3 feet above the top of the pile—in easy access to children playing on the pile. It was not disputed that these wires, so near the sawdust pile, were not insulated, but "naked and live wires," carrying 11,000 voltage. As to how the injury occurred, the jury accepted the plaintiff's theory.

The learned and accurate judge in the court below who tried this case charged the jury: "Now, gentlemen, one who maintains dangerous instrumentalities or appliances as could or would likely attract children in play, or permits dangerous conditions to exist, with a knowledge that children are in the habit of resorting there for amusement, or by the

exercise of reasonable care and prudence ought to know that children are so in the habit of going there to play, is˙ liable to a child who is injured—that is, as to a child of tender years who from infirmity is incapable of exercising a proper care or degree of care for its own protection. The degree of care must be commensurate with the dangerous nature of the article, and greater or less as would be reasonably expected of young ˙children. A boy of the age of 14 years is presumed to have sufficient capacity to be able to sense danger and to have power to avoid it, and this presumption will stand unless rebutted by proof of such lack of intelligence as is usual of a boy of similar age. The law imposes upon minors the duty of giving such attention to their surroundings and acts to avoid dangers as may reasonably be expected of persons of their age and capacity. Children, as well as adults, must use such discretion as persons of their age and discretion ordinarily have, and one who is apparently capable of sensing peril or danger cannot be permitted with impunity to indulge in conduct which he knows or ought to know to be reckless." The court below gave a full and accurate charge on the issues submitted, applied the law to the facts, and gave fairly the contentions of the parties. No exception was taken to the charge.

Is defendant liable to plaintiff on the facts and circumstances of this case? We think it is, and that the nonsuit was properly refused. The weight of authorities in this and other States sustain this view.

In *Haynes v. Gas Co.,* 114 N. C., p. 203, *Burwell, J.,* it was held that John W. Haynes, about 10 years of age, who was "a very healthy, intelligent, moral and industrious boy, well educated for his age," who was killed by taking hold of a "live wire," on or near the sidewalk over which he was passing in the city of Raleigh—the principle of *res ipsa loquitur* applied. "A complete prima facie case of negligence was made out," . . . and "we are clearly of the opinion that there was no evidence of contributory negligence."

In *Harrington v. Wadesboro,* 153 N. C., p. 437, *Hoke, J.* (defendant was held liable), the facts were: "That on 4 July, 1908, the Bratton Amusement Company was conducting a moving-picture show under a tent erected on an open and vacant lot in the town, being an exposed and public place, and the defendant, under a contract with the company, had installed the wires and was supplying the electricity for carrying on the enterprise. That the wire conducting the electricity to the tent passed over a path in which numbers of persons were accustomed to move, and had been negligently placed or allowed to sag so that persons going along the path could easily reach it, some of the witnesses saying it was so low that one would have to bend his body to pass under it, and just at this point the wire was uninsulated for a space of a foot or more. That the intestate, an inexperienced boy of 17 years of age, living with

his mother and doing work on the farm, in passing along the path, caught hold of the wire and received a shock that killed him."

In *Ferrell v. Cotton Mills*, 157 N. C., p. 528, *Walker, J.* (defendant was held liable), in the opinion, citing numerous authorities, held in general: "The defendant permitted a guy-wire of its electric pole to become loose from its fastening in the ground and to hang down its pole at an exposed and uninclosed place within a few inches from a naked and uninsulated wire charged with a deadly or high voltage of electricity. This hanging guy-wire was attractive to the boys, who would swing on it from the pole and back again, and who would congregate there for the purpose. About eight months after the guy-wire became loose, the plaintiff's intestate, his 6-year-old son, while swinging, as indicated, was instantly killed by electricity passing suddenly through the guy-wire from contact with a highly charged wire carrying the current: *Held*, the defendant knew or should have known of the dangerous condition existing, and that children would be attracted to and were accustomed to play with the loose guy-wire, and the technical defense that the plaintiff's intestate was a trespasser would be unavailing."

In *Benton v. Public Service Corp.*, 165 N. C., p. 355, *Brown, J.* (the defendant was held liable), the facts were: "The evidence tends to prove that the plaintiff's son, 12 years old, and not well grown for his age, was killed, on 22 June, 1909, by coming in contact with an uninsulated high-power wire of the defendant, carrying some 2,300 volts of electricity. The boy was attending a Sunday-school party on Eugene Street, one of the main thoroughfares of the city of Greensboro, with some other boys, and when they got through with the entertainment in the house, went out on the street and were standing around on the sidewalk, under and near to the tree in which the intestate of the plaintiff was killed. Two other boys besides the intestate of the plaintiff climbed up the tree, and three or four more were standing around the tree on the sidewalk. The intestate of the plaintiff came in contact with the wires in the tree, one of them burning his hand and the other his left leg as if a hot iron had been run across the flesh. The other boys in the tree were not injured. The wires were exposed 1½ to 2 feet in the trees and were about 20 feet above the ground. The insulation was rubbed off by the limbs coming in contact with the wires and rubbing against them. The tree was between 30 and 40 feet in height, and the limbs came within 7 feet of the ground, making it an easy tree to climb. The evidence also tended to prove that Eugene Street is a thickly settled and populous street, and that the defendant's wires along this street were in very bad condition as to insulation, especially where they passed through the trees, and that at night especially the wires in this and other trees near by could be seen 'sparking.'" The defendant's

attention was called to the condition of its wires before the injury, and they were not repaired. See, also, *Ragan v. Traction Co.,* 170 N. C., p. 92.

In *Love v. Va. Power Co.,* 86 W. Va., p. 393: it is held: "A company maintaining an electric line, over which a current of high and dangerous voltage passes, in a place to which it knows or should anticipate others lawfully may resort for any reason, such as business, pleasure, or curiosity, and in such manner as exposes them to danger of contact with it, by accident or inadvertence, is bound to take precaution for their safety by insulation of the wire or other adequate means. A declaration alleging that defendant, for a period of two years or more, permitted its uninsulated high-power transmission cables, carrying a current of dangerous voltage, to remain within 4 feet of the top of a pile of slate, slag or other refuse from a near-by coal mine, lawfully placed there subsequent to the erection of the cables by the owner or lessee of the tract over which they passed, when defendant knew or should have known that children of miners living in that neighborhood had long been accustomed to play on the pile, but made no effort to safeguard and protect them by the insulation, elevation or removal of its lines to another portion of the tract, as a result of which failure plaintiff's intestate, a child of tender years, was killed, states a cause of action."

In *Talkington v. Washington Water Power Co.,* 96 Wash. Rep., 386 (the defendant was held liable), it was held: "The negligence of a power company in maintaining high-voltage wires on the roof of a warehouse, and the contributory negligence of a boy 10 years of age who came in contact with the wires after being warned to keep away from them, are questions for the jury, where it appears that the power line was maintained 15 inches above the comb of the roof; that the roof was easily accessible to boys by means of a low lean-to with a practically flat roof; that boys were in the habit of playing on the roof, and that the boy thought the wires were ordinary telephone wires, and there was testimony that he was not warned until the very instant of the accident."

In *Meyer v. Menominee & Marinette L. & T. Co.,* 151 Wis., p. 279 (defendant was held liable), it was held: "A boy, about 15 years old, while upon the top of a lumber pile, took hold of defendant's electric-lighting wires and was killed. The lumber pile had for a year stood adjacent to a much-traveled private road through a lumber yard, was about 24 feet high and was easy of access by children, steps to the top of the pile being formed by projecting boards. For many years lumber had been piled to about the same height at that place, and some fifty children living near by were accustomed to play upon the piles. The wires, which were strung upon poles along the side of the road, passed

over the pile in question 21 inches above its top. There was evidence that they were very slack, sagging much more than is customary; that where they passed over the pile the insulation was worn or rotten off; that defendant had been notified and warned of the condition of the wires and poles about eight months before the accident, and it knew or ought to have known that children were likely to be upon the lumber pile: *Held,* that the jury were warranted in finding that defendant was negligent in the use of its wires so placed and strung, and that it ought reasonably to have anticipated that some child would be injured thereby, and, there having been no contributory negligence on the part of the deceased or his parents, a recovery was properly had against the defendant, although the boy was a bare licensee or invitee upon the lumber pile."

In *Temple v. Electric Light and Power Co.* (Miss.), 11 L. R. A. (N. S.), 449, the Court said: "It is perfectly idle for the appellee to insist that it was not bound to have reasonably expected the small boys of the neighborhood to climb that sort of tree. The fact that such boy would, in all probability, climb that particular tree, being the kind of tree it was, was a fact which, according to every sound principle of law and common sense, this corporation must have anticipated. The argument that it did not almost suggests the query whether the individuals composing this corporation, its employees and agents, had forgotten that they were once small boys themselves. The immemorial habit of small boys to climb little oak trees filled with abundant branches reaching almost to the ground is a habit which corporations stretching their wires over such trees must take notice of."

The editors of the L. R. A., in citing the *Temple case, supra,* after reviewing a number of decisions, say: "As to the duty to guard against danger to children in placing electric wires, no rule can be enunciated that would be accepted by all courts. As in the 'turntable' cases and those involving other 'attractive nuisances,' the authorities are in irreconcilable conflict. It would seem, however, that reason and humanity, alike, support the rule laid down in the above case, that those dealing with such an extremely dangerous agency as electricity should, in stringing their wires in places where it is reasonably probable that children will go, be charged 'with the very highest degree of skill and care' to protect the children from injury while in the vicinity of such places, even though they may be trespassers."

In *Parker v. R. R.,* 169 N. C., p. 68, defendant was held not liable. The wires were located under the bridge, and the boys knew what they were. The injured boy, being dared by some of the other boys, reached 22 inches under the bridge and touched the wire rather than take a dare.

GRAHAM *v*. POWER CO.

In *McAllister v. Pryor,* 187 N. C., p. 832, we have recently said, under another aspect, in general: "There is nothing by which the user of an electrical appliance can detect the presence of an unusual high voltage or deadliness of current before touching the wire or coming in contact with it, and the greatest degree of care is required of those furnishing this deadly instrumentality to guard against the danger of its ordinary use as the circumstances may require. Where the furnisher of electricity for a building was, under its contract with the owner, required to furnish a low voltage of electricity for lighting and various domestic uses, and there is evidence tending to show that in attempting to iron clothes within the building with an electric iron the plaintiff touched the ironer and received a severe shock of electricity, to her injury, which should not and would not ordinarily have occurred by such use had the defendant supplied the current it had contracted to do, the doctrine of *res ipsa loquitur* applies, and the issue of actionable negligence should be submitted to the jury, denying defendant's motion as of nonsuit thereon."

The great weight of authorities sustain the contention of plaintiff in this case. The development of electric power is of vast importance to the commercial, domestic and civic life of our people, and should be encouraged. Electricity is an invisible and subtle power. In the manufacture and distribution it requires trained and skilled artisans. People, unless educated in the use of it, know little about its deadly qualities. It can only be discovered by the touch, and that brings bodily affliction and death if there is a high voltage in the wires. Those who are engaged in the business are held by the courts to the highest degree of care in its manufacture and distribution.

The protection to be given the uninformed public, especially children, is not burdensome or expensive. Naked wires can be easily clothed—insulated. In the instant case the defendant's wires, running within 2 or 3 feet of the top of the sawdust pile, were naked "live wires," carrying a high voltage—a deadly current of electricity. It was in a community of numerous families, near a road and a place frequented by the negro boys of the community, where they played, as was their custom. This was known, or by the exercise of reasonable care ought to have been known, to defendant.

We think there was sufficient evidence to go to the jury, and the motion as of nonsuit was properly refused. On the entire record, we can discover

No error.