CHARLES F. MURPHY, ADMINISTRATOR OF WEAVER MURPHY, v. CAROLINA POWER AND LIGHT COMPANY.

(Filed 9 January, 1929.)

1. **Electricity—Liability for Injuries Caused Thereby—Evidence of Negligence.**

    Where there is evidence tending to show that the plaintiff's intestate was killed by catching hold of a wire fence to which a high voltage of electricity has been transmitted by induction from a heavily charged wire of the defendant negligently coming in close proximity with it, that the intestate was badly burned on his hands and body with other evidence of burning along the fence: *Held,* not prejudicial error to defendant for plaintiff's witness to testify that as defendant's employees were finishing making the place safe he *told them* in response to their inquiry that if they had heard it "popping and cracking" they would have thought it had burned much, there being other evidence to that effect.

2. **Same—Res Ipsa Loquitur.**

    The doctrine of *res ipsa loquitur* applies when the evidence discloses that the plaintiff's intestate, a thirteen-year-old boy, was killed by a deadly voltage of electricity from a wire fence, with further evidence that the wire fence was charged by an induced current caused by a heavily charged transmission wire coming in close proximity thereto.

3. **Same—Nonsuit.**

    Evidence tending to show that the plaintiff's intestate, a lad thirteen years of age, and being where he had a right to be, was killed by a high voltage of electricity from the defendant's transmission wire, that the

defendant had been notified in time to cut off the current, which under the circumstances could have been done in a very short time, and the injury, subsequently occurring, could have been thus avoided, is sufficient to take the case to the jury upon the actionable negligence of the defendant in causing the death, and under the facts of this case, contributory negligence does not arise.

**4. Trial—Instructions—Requests for Instructions.**

Where the instructions of the court fully and substantially cover the law of the case, the plaintiff must submit special requests for instructions on any particular phase of the evidence he may desire instructions.

**5. Appeal and Error — Review — Discretion of Court — Setting Aside Verdict for Excessive or Inadequate Damages.**

A motion to set aside a verdict for excessive damages is addressed to the sound legal discretion of the trial judge and is not reviewable on appeal.

**6. Trial — Taking Case or Question From Jury — Nonsuit — Waiver — Motions.**

A defendant to an action waives his right to object to the sufficiency of the evidence by not making a motion as of nonsuit at the close of the plaintiff's evidence and renewing the motion at the close of all the evidence in the case.

APPEAL by defendant from *H. Hoyle Sink, Special Judge,* and a jury, at May Special Term, 1928, of BUNCOMBE. No error.

This is an action for actionable negligence brought by Charles F. Murphy, administrator of Weaver Murphy, for the death of his son, Weaver Murphy.

Defendant is engaged in the business of furnishing and selling electricity. One of its principal places of business is in Asheville, N. C., and the electric current is transmitted over its power lines to the surrounding section. There was a power line of defendant company running through the Newfound section in Buncombe County, N. C. Charles F. Murphy lived in that section and farmed, and the Power Company's lines ran through the farm he leased. He was also deputy fire warden. He had a son, the deceased, Weaver Murphy, 13 years of age. He was going to school while in session. He was "bright in his books, learned quickly," physically good and obedient. The boy had been told if he happened to see any fire to go to it and control it, and if necessary to call in others. On 27 April, a few minutes after 1 o'clock p.m., his father sent him to a store some half a mile away to get some fence staples and nails. His son did not return, and the father went and searched for him. His father testified: "I found him hanging to a wire fence; he was dead; it was 7:30 p.m., when I found him clinging to a wire fence; he had hold of the wire with his right hand underneath, and on top with his left hand, and he took hold of it like a man would to

bring it down to crawl through it, and he had a tight grip on it. I pulled his hands loose from the wire with my hands; his body was apparently cold. I found burns on him and his clothes were burned pretty bad. When I pulled his hands loose from the wires, it pulled some of the skin off his hands and left the skin on the wire; his hands were burned all right. Where I found the boy there was some burns about the side of his face and his hip where he laid against the fence and the shoulder which was next to the wire was burned pretty bad. The shrubbery all along the wire was burned off and killed, and then there was some beyond where he was found burned and killed. . . . I didn't know why he would go over there unless he went to see about the fire. I didn't send him over there at all, but I supposed he went there. There was fire over there in the edge of the woods. You could see the smoke from that fire from the road the little boy went along as he went to the store."

One Reeves testified: "I came something like fifteen minutes of 12 o'clock for dinner, and was washing and my wife was in the kitchen there and said, 'What is that making that fuss?' The wire had come down. I said, 'Sounds like an airplane.' I couldn't see it. She said, 'Come here, there is something on fire.' She said, 'It is that power line down,' and I stepped out in the yard where I could see and I said, 'Yes, it is a wire down,' and I said, 'You go and call the Power Company,' and she said, 'I don't know who to call,' and I said, 'Call the operator at Leicester; she can call them, and tell them to cut off the line. It is burning up things there.' "

Q. "Is this the lady that was the switchboard operator at Leicester?" A. "Yes, sir. She tried to call her and said the phone was popping and cracking so she couldn't handle it. I said I would try and get Mrs. Brooks to understand the power line was down, and for them to cut it off, it was dangerous; my cows were in the field. My clock said fifteen minutes to twelve when I used the phone—phoned Leicester; there is a phone line at Leicester that connects with Asheville; that phone line was taken care of that evening some time. I don't know what time it was repaired. I did not see the men come out there. It was about twenty minutes of two o'clock, and it was still popping and cracking—that's by my clock."

Mrs. L. C. Brooks testified: "In my home he (Weaver Murphy) was nice and polite, and seemed all right in every way. His physical appearance was good. I would think he was fairly well developed for a boy of that age. I operated the switchboard at Leicester at the time of his death. There is a telephone line extending up the Newfound section; there was a line went into the home of Mr. Reeves. I remember Mr. Reeves calling me, but at that time I had already called the power

trouble. . . . He said the line was down, and I called them and told them they had a line down. I called to the Power and Light Company here in the city. I got connection with them. The first time I called I told them I had a line out of order—a telephone line out of order—caused by the power line; it caused my line to be out of order. The next time I called I told them I had been notified that they had a wire down on Newfound—an electric wire down on Newfound—and they said they would send a man right out. That was somewhere along about noon hour; it was somewhere around the middle of the afternoon that the trouble cleared up some. . . . Of course it didn't get clear the whole afternoon. . . . It was just a few minutes after I got this information until I got the Power Company—just as soon as I could call the Asheville operator and she got me a connection with the Electric Company men with a man on the line; it was just a few minutes before Mr. Reeves called that I saw this trouble and phoned them. I went on the line and thought some one was calling me and discovered the trouble. I got a reply from the Power Company that they would send a man out immediately. . . . This was in the Newfound section. I again called the Power Company after Mr. Reeves called me. I told them I had been notified they had a wire down on the Newfound line I had called about. I didn't know the first time what the trouble was. I told them I had a line out of order, caused by the power line. I don't know who I talked with when I first called. I never do ask who answers the phone since they have the number changed. I asked for the trouble man; at that time they had no switchboard; I called for the trouble man. I have always done that since I have been calling the electric people."

H. A. Ballard, maintenance superintendent of defendant, testified: "I am not familiar with the survey of the Canton line—the line that runs out Newfound to Canton. That line was built for 44,000 voltage. The line ordinarily carried 44,000. I couldn't say that I was familiar with the place where the switch is on that line. I know we have disconnections in the Weaver section, as it is known in the Carolina Power Company. They have disconnections on the line, but I don't know how many. There is a power station. I know where it is. This power can be taken off by a disconnect. I don't know whether they have an oil switch on their line or not at that time, but I think they have. This disconnection of theirs is controlled by one pull of the handle; three switches are pulled out at once, as I remember it. The operator would have to go one hundred feet and cut the power off by pulling a lever."

J. B. Rogers testified: "I was plowing on the north side of the creek right opposite where the boy was killed, or where the wire was down. I heard a noise, and it was sort of cloudy and the wind blowing a little,

and I thought probably the lightning struck the wire; it kept crackling and popping, and I noticed the sparks flying, and I went on with the plowing, and a little later on I heard it again. I know where this pole that has been spoken of by the witnesses is. It is pretty close to the cross fence. I wouldn't say exactly how close, but pretty near the fence. The fence is a wire fence tacked on the post. This high voltage wire that has been spoken of hung right over that wire fence. I first began to hear this popping somewhere near two o'clock. It was after I went out to my work. I didn't notice exactly what time. I saw some sparks and smoke—sparks going from the wires and places catching on the fence—and I also saw some smoke up near the edge of the woods. I don't think the woods were set afire. There were leaves burned and just some rotten logs by the fence. . . .

(This witness went with Chas. F. Murphy and found the boy about 7:30.)

"I went along down the fence ever so far, and directly I discovered the boy hanging up on the fence with his hands to the fence—fell back against it. . . . Afterwards I was over there and noticed some of those wires looked like they had been melted and burned with some kind of heat. I saw some shrubbery and bushes scorched. I found them on both lines. I would think it was right around three o'clock when I saw some men come there; maybe a little later; I wouldn't take no less. The first I noticed of them they ran up there near the burning and stopped the truck. I didn't know who they were until after they got done and started through the field. I saw their fixtures and I knew it was men going up there to fix the line. I believe there were as many as three, maybe four. I didn't pay any attention to the kind of truck they came in. They went up to this pole that has been spoken of. I saw them looking around there, and then I could see them drawing up something like they were fixing it. They were insulators, looked to me like. They were getting the thing they were drawing up from below—looked like from the ground up. I couldn't see the wire that far. I don't know how long they worked there; they weren't there so awfully long."

U. F. Ford testified: "I was there in the road loading logs there, and this line was down over there in the field at this post, and Mr. Clark there and his force came up and fixed the line up while I was loading the logs there, and come back and got in the truck and went off. It was about 3 o'clock."

S. A. Johnson, superintendent of Power Company, testified: "I was superintendent of lines, power houses and construction and general work. I am familiar with the Weaver power plant. I built it. It was the place where the power line which leads to Canton went from at that time. Those lines leading to Canton are called 'three-phase,' three

lines; they are not insulated wires; the voltage is 66,000. I believe from 1,700 to 2,000 volts ordinarily is used in electrocuting a man. On April of last year there were two switches on there. There is a switch on the 6,600 volt side that goes through the transformer and steps up to 66,000, and on the 66,000 volt side there is also a set of automatic switches on the 66,000 volt side. There are telephone communications in the power house. It would take about a half minute to cut off the power on that line after receiving notice of trouble on it; that kills the line. . . . I did not have anything to do with repairing the line; they had it repaired when I got back; they have instrument on the boards at this power house to show when the line gets down and is grounded, but as long as the line don't get down and isn't grounded it doesn't show it. They are ampmeters and various kinds that show load. When the load goes up high enough the current trips the automatic switch, but in this instance the wire was swinging something like eighteen inches above the fence—wasn't touching it. If that had been down on the wire, I know well enough if it had been down and made a ground it would have knocked it out. I have been there too much and seen it happen. I don't know of my own knowledge when it did knock it out. I only know what the men told me. If the wire should be near to a wire fence over which it passed it would have electrified the wire fence without being in contact with it; that is what is called an induced current. That would not register on the automatic signals because the ground wasn't heavy enough, if it got close enough depending upon the degree of contact. If it had been down where it got a ground the automatic instruments would have worked. I don't know whether they did work or didn't—only what I was told. If they had worked they wouldn't have been able to have kept them in. They are so automatic when it goes down you can put it right back in like that and there is no keeping it there."

Robert S. Shook testified: "I have driven by from Newfound to Asheville in a Ford. As to the way I drive I wouldn't come as quick as a whole lot of men because I am a bad driver. It was a good time before I ever learned to get here and back. I had several wrecks. I don't know what was wrong this morning. I left home 15 minutes to 8, and when I got to the square it was 20 minutes after eight, and I drove very common I thought—that is 35 minutes. I wasn't trying to make any time. . . . Just an ordinary way it would take him 10 to 15 minutes."

The plaintiff alleges: "Par. 18. That on 27 April, 1927, the plaintiff's intestate, the said Weaver Murphy, without knowledge of the fact that said fence was charged with said deadly and invisible agency, and electric current, attempted to pass through the wire fence connected with

the fence which was charged as aforesaid, when immediately upon touching the said fence his hands, neck and body were attracted and held fast thereto by the deadly and powerful force of said electric current, which current then and there literally burned alive and electrocuted the plaintiff's intestate, whose lifeless form, many hours after his electrocution, was found still resting against the wires of said fence."

The defendant answered: "That the allegations contained in paragraph 18 of the complaint are, upon information and belief, denied, except that the defendant admits that the plaintiff's (intestate came in contact with) current furnished by this defendant, and in consequence thereof lost his life, but the defendant alleges that said death was caused by an accident and by or through means which could not have reasonably been foreseen or provided against. . . . And for further defense the defendant says that if the plaintiff's intestate, Weaver Murphy, came to his death by reason of having come in contact with a wire fence which had been charged by electricity from one of the defendant's wires, then that such condition was brought about by an accident or by the unforeseen and unpreventable effects of the weather or by a windstorm or other unavoidable occurrence over which the defendant had no control; in consequence of which its electric wire was caused to fall upon said fence, and that defendant had no notice of said condition and that it had not existed for a sufficient length of time for the defendant to have sufficient notice thereof, and in consequence the defendant is not liable and is not guilty of any negligence which caused the death of the plaintiff's intestate."

When the plaintiff rested his case, the defendant rested. Whereupon, the court was advised by counsel for the plaintiff and the defendant that no issues had been prepared; whereupon the court stated to counsel that no issue of contributory negligence arose upon the pleadings or the evidence, which was concurred in by counsel for the plaintiff and the defendant. Therefore, the court suggested that the two usual issues of negligence and the amount of damages would be all that would be required. This, likewise, was concurred in by counsel for both sides. Whereupon, the court proceeded to dictate to the court reporter the issues that are shown in the record. When written up, the court personally placed before counsel for plaintiff and the defendant copy of the issues, which copies were used by each of counsel and referred to by them in their respective arguments to the jury. No objection was made to the court relative to the issues during the trial.

The issues submitted to the jury and their answers thereto were as follows:

"1. Was the defendant guilty of negligence as alleged in the complaint? Answer: Yes.

"2. What amount of damages, if any, is the plaintiff entitled to recover of the defendant? Answer: $23,000."

The material assignments of error and other necessary evidence will be set forth in the opinion.

*Wells, Blackstock & Taylor and J. E. Swain for plaintiff.*
*Martin & Martin and Rollins & Smathers for defendant.*

CLARKSON, J. One Rogers, a witness for plaintiff, was asked the following question: "Did you have any conversation with any of them, and, if so, what did they say?" A. "One of the gentlemen said to me, 'Did it burn much?' and I said, 'You would have thought it burned if you could have heard it popping and cracking,' and they said, 'I don't think there is any danger now; we have fixed it back.' That is all we said." Defendant contends this was error. We cannot so hold. This conversation took place five or ten minutes after the repair force had fixed the power line and before the repair force had gotten back in the truck that they came in, and while the witness was nearby looking at what was being done by the repair force.

All the evidence, on this aspect, was to the effect that it burned and there was popping and cracking. It was a matter of sight and common knowledge that when the wires charged with electric current were stretched high above the fence, which the witness saw the repair force do, that there would be no danger. The superintendent of the line, a witness for plaintiff, stated if the wires should be near to a wire fence over which it passed it would have electrified it without being in contact with it, and that is what is called "induced current." All the evidence was to the effect that the power line was out of repair. Mr. Reeves testified, "She said, 'It is that power line down,' and I stepped out in the yard where I could see and I said, *'Yes, it is a wire down.'*" The telephone operator at Leicester was immediately called up and *told that the line was down.* The telephone operator notified defendant, "*I told them I had been notified that they had a wire down on Newfound,* and they said they would send a man right out—that was something along about the noon hour." U. F. Ford testified: "I was there in the road loading logs there and *this line was down* over there in the field, at this post, and Mr. Clark there and his force came up and fixed the line up while I was loading the logs there, and came back and got in the truck and went off. It was about three o'clock." We can see nothing prejudicial in the question and answer from the facts disclosed by this record. The company knew its line was down and dangerous, and sent men out to fix it, which they did.

The cases cited and the principle of *res gestæ* invoked by the defendant are not applicable. We may say that the observation in 10 R. C. L.,

p. 975, has a bearing: "It is not easy always to determine when a declaration is a part of the *res gestœ*. It is dependent upon the particular circumstances under which the declaration is made. The courts recognize the difficulty of laying upon this subject a rule that may be applied in every case. The tendency of recent adjudications is to extend rather than to narrow the scope of the introduction of evidence as part of the *res gestœ*."

A witness, Robt. S. Shook, was asked, "Did you notice his body? Describe his appearance—the body of the child." A. "His hands were gripped that way (indicating), and we had to pull them open to see the inside of the hands. They were burned and scorched and scars on his neck and one little one up here, and on this hip here down almost on that, was a place bigger than my hand—just looked cooked—the flesh was just cooked at three or four places on the back of his shoulder, back here—just different places."

The defendant, at the time, objected that in view of the admissions in this case that it was not material. Similar evidence of the boy's father was introduced by plaintiff without objection. The testimony tended to show how excessive and deadly the voltage was. Defendant contends this was error. We cannot so hold. *McAllister v. Pryor,* 187 N. C., at p. 839.

In *Ellis v. Power Co.,* 193 N. C., at pp. 361-2, it is said: "Those who are engaged in the electric business are held by the courts to the highest degree of care in the manufacture, distribution, maintenance and inspection. . . . Electric power is an industry-producing agency, and the hydro-electric development has been one of the greatest factors in the State's progress, and especially its industrial expansion. Every legitimate encouragement should be given to its manufacture and distribution for use by public utility corporations, manufacturing plants, homes and elsewhere. On the other hand, the highest degree of care should be required in the manufacture and distribution of this deadly energy and in the maintenance and inspection of the instrumentalities and appliances used in transmitting this invisible and subtle power."

"The maxim *res ipsa loquitur* applies in many cases, for the affair speaks for itself. It is not that in any case negligence can be assumed from the mere fact of an accident and an injury, but in these cases the surrounding circumstances which are necessarily brought into view, by showing how the accident occurred, contain without further proof sufficient evidence of the defendant's duty and of his neglect to perform it. The fact of the casualty and the attendant circumstances may themselves furnish all the proof that the injured person is able to offer or that it is necessary to offer. Sher. and Redf., on Negl., sec. 59; *Shaw v.*

*Public-Service Corp.,* 168 N. C., p. 618." *O'Brien v. Parks Cramer Co., ante,* 359. It is well settled from the facts here disclosed that the principle of *res ipsa loquitur* applies.

The matter has been so thoroughly considered in this jurisdiction that we refer to some of the cases on the subject: *Haynes v. Gas Co.,* 114 N. C., 203; *Mitchell v. Electric Co.,* 129 N. C., 169; *Turner v. Power Co.,* 154 N. C., 131; *Shaw v. Public-Service Corp.,* 168 N. C., 611; *McAllister v. Pryor,* 187 N. C., 839; *Graham v. Power Co.,* 189 N. C., 381; *Helms v. Power Co.,* 192 N. C., 784; *Ramsey v. Power Co.,* 195 N. C., 788; *O'Brien v. Parks Cramer Co., supra.*

Outside of the principle of *res ipsa loquitur,* which applies, defendant was notified about the defect about a quarter to 12 o'clock. (1) Defendant was notified before 12 o'clock, and from the evidence had ample time to come and repair the power line that transmitted this dangerous and subtle power that was "popping and cracking" before the boy was electrocuted. He was sent to the store by his father after 1 o'clock. (2) H. A. Ballard, the maintenance superintendent, testified: "This disconnect of theirs is controlled by one pull of the handle; three switches are pulled out at once, as I remember it; the operator would have to go one hundred feet and cut the power off by pulling a lever." S. A. Johnson, superintendent, testified: "It would take about a half minute to cut off the power on that line after receiving notice of trouble on it; that kills the line."

The lad was 13 years of age. In a case of this kind, plaintiff's intestate was not guilty of contributory negligence. *Graham v. Power Co.,* 189 N. C., 381, and cases cited. See *Brown v. R. R.,* 195 N. C., 699. Defendant failed to plead contributory negligence. It was not entitled to the issue. C. S., 523. *Fleming v. R. R.,* 160 N. C., 196; *Moore v. Chicago Bridge, etc., Works,* 183 N. C., 438.

It may be noted that the exceptions to the charge do not comply with the rules. *Rawls v. Lupton,* 193 N. C., 428. If our brethren at the bar will examine that case they can readily make up a case on appeal to this Court in accordance with the well settled rules.

We do not think there is any error in the charge, and it complies with C. S., 564. The court below defined, in accordance with all the authorities, the law of negligence, proximate cause and damages. The contentions were fairly given on both sides. The case is not complicated as to the law or facts. The jurors are presumed to be men of "good moral character and sufficient intelligence."

In *Alexander v. Cedar Works,* 177 N. C., at p. 149, it is said: "If the instructions of the court to the jury were not sufficiently full and explicit, or plaintiffs desired any particular phase of the case to be stated, they should have submitted a special request for what they wanted.

*Simmons v. Davenport,* 140 N. C., 407; *Potato Co. v. Jeanette,* 174 N. C., 237." *Davis v. Long,* 189 N. C., at p. 137; *O'Brien v. Parks Cramer Co., supra.*

The defendant complains of the amount of the verdict—the value of the life of the boy, as fixed by the jury. The court below refused in its discretion to set the verdict aside and grant a new trial.

In *Hyatt v. McCoy,* 194 N. C., at p. 762, it is said, quoting numerous authorities: "It is provided by statute that the judge who tries the cause may in his discretion entertain a motion, to be made on his minutes, to set aside a verdict and grant a new trial . . . for excessive damages (C. S., 591); and it has been said 'That there is no reason which can be advanced in favor of setting aside verdicts because of excessive damages which does not apply to setting aside for inadequacy of damages.' *Benton v. Collins,* 125 N. C., 83. So it has been held in a number of cases that to set aside a verdict and to grant a new trial for excessive or inadequate damages is, as a rule, the irreviewable right of the presiding judge."

In the present case defendant did not make a motion for judgment as in case of nonsuit at the close of plaintiff's evidence nor at the close of all the evidence, that the evidence was not sufficient to be submitted to the jury, under C. S., 567. The law is well settled by numerous authorities that the matter is waived as to the insufficiency of the evidence to be submitted to the jury on the question of negligence.

In *Nowell v. Basnight,* 185 N. C., at p. 148: "If the first motion is overruled, the defendant may except and go to the jury; or except, introduce evidence and renew motion after all the evidence. . . . Exception is waived if motion is not renewed (citing authorities)." In the above case the change of practice, under C. S., 567, is lucidly discussed by *Walker, J.* On the whole record we can find

No error.